Kim D. Cannon, Wyoming State Bar #5-1401
J. Mark Stewart, Wyoming State Bar #6-4121
Davis & Cannon, LLP
422 West 26th Street
P.O. Box 43
Cheyenne, WY 82003
Phone: 307/634-3210
Facsimile: 307/778-7118
cannon@davisandcannon.com
mark@davisandcannonchey.com

John A. Hutchings (*pro hac vice*)
Dill Dill Carr Stonbraker & Hutchings, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone: 303/777-3737
Facsimile: 303/777-3823
jhutchings@dillanddill.com

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 05 2010

Stephan Harris, Clerk
Cheyenne

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

RUSSELL C. FIELDGROVE; MARY JANE )
FIELDGROVE; and CECIL H. FIELDGROVE )
TRUST, CECIL H. FIELDGROVE TRUSTEE, )
)
    Plaintiffs, )
)
v. )
) Case No. 10CV0104
DENNIS R. LAWRENCE; RANDALL POPE; )
CAPWEST SECURITIES, INC., a Colorado )
corporation; CAPSTONE FINANCIAL GROUP, )
INC., a Nevada corporation; COLORADO )
CAPITAL HOLDINGS, LLC, a Nevada limited )
liability company; DALE KEITH HALL; DIRECT )
CAPITAL SECURITIES, INC., a Delaware )
corporation; TIC CAPITAL MARKETS, INC., a )
Delaware corporation; CLAY HARRISS )
WOMACK; PACIFIC SECURITY INCOME )
PARTNERS, LP, a Texas limited partnership; )
PACIFIC SECURITY GROUP, INC., a Texas )
corporation of forfeited existence; PERSONAL )
MONEY MANAGEMENT, LLC, a Colorado )
limited liability company; STEVE HOLMES; )

RICHARD HANCOCK; and DEBRA )
HARRAWOOD WHITE. )
)
          Defendants.

## AMENDED COMPLAINT AND JURY DEMAND

COME NOW the Plaintiffs, Russell C. Fieldgrove, Mary Jane Fieldgrove, and the Cecil H. Fieldgrove Trust, Cecil H. Fieldgrove Trustee, by and through their attorneys, Davis & Cannon, LLP and Dill Dill Carr Stonbraker & Hutchings, P.C., and for their Amended Complaint against the Defendants state as follows:

### SUMMARY OF THE COMPLAINT

1.      Until late 2006, when Russell C. Fieldgrove and Mary Jane Fieldgrove ("Rusty and Mary Jane Fieldgrove") were fraudulently induced to make the investments described in this Complaint, the only investments Rusty and Mary Jane Fieldgrove had ever made were in the ranch owned and operated by Russell C. Fieldgrove together with his father Cecil Fieldgrove. Rusty and Mary Jane Fieldgrove owned approximately one-half of the ranch while Cecil Fieldgrove owned the other half. From approximately 2000 to 2006, Mary Jane Fieldgrove worked as a bookkeeper for the Defendant Dennis R. Lawrence ("Lawrence").

2.      Cecil H. Fieldgrove ("C. Fieldgrove") was, like his son, Russell Fieldgrove, almost completely lacking in investment knowledge and experience. C. Fieldgrove's principal occupation during his lifetime was that of a rancher. As described above, C. Fieldgrove owned and operated a ranch with his son, Russell C. Fieldgrove. By 2006, C. Fieldgrove's interest in the ranch owned with his son, Russell C. Fieldgrove, was owned through the Cecil H. Fieldgrove Trust, Cecil H. Fieldgrove Trustee (hereinafter the "C. Fieldgrove Trust") (in this Complaint,

Russell C. Fieldgrove, Mary Jane Fieldgrove and the C. Fieldgrove Trust are collectively referred to as the "Fieldgroves").

3. By 2006, the Fieldgroves had determined to sell the ranch. With financial advice and assistance from Lawrence, the ranch was sold in 2006. Lawrence advised Rusty and Mary Jane Fieldgrove against conducting what is known as a "1031 exchange." Thus, after the payment of taxes, expenses of sale, and various debts, Rusty and Mary Jane Fieldgrove were left with approximately $450,000.00. Their only other assets consisted of automobiles and miscellaneous personal property. The C. Fieldgrove Trust received net proceeds from the sale of the ranch of approximately $800,000.00.

4. Lawrence, together with Randall Pope ("Pope"), who is a registered representative employed by CapWest Securities, Inc. ("CapWest"), a registered broker-dealer, recommended, advised, induced, and sold to the Fieldgroves non-liquid, high risk, direct participation program investments in two private offerings. These direct participation program investments were unsuitable for Rusty and Mary Jane Fieldgrove as they were non-liquid, high risk, at substantial risk of total loss, and represented all of Rusty and Mary Jane Fieldgrove's liquid assets, and virtually one hundred percent of Rusty and Mary Jane Fieldgrove's assets. The direct participation program investments were unsuitable for the C. Fieldgrove Trust as they were non-liquid, high risk, at substantial risk of loss, and represented a disproportionately high percentage of the C. Fieldgrove Trust's and C. Fieldgrove's assets.

5. The two direct participation program investments totaling $450,000.00 sold to Rusty and Mary Jane Fieldgrove and totaling $690,000.00 sold to the C. Fieldgrove Trust were both fraudulent Ponzi schemes. The U.S. Securities and Exchange Commission ("SEC") has

3

brought proceedings against the promoters of each of these direct participation program investments ("DPP Investments") which are the subject of this action, in each case alleging it to be a fraudulent Ponzi scheme. In each case, as more specifically described herein, the SEC obtained orders freezing the assets of the promoters of the fraudulent Ponzi schemes and appointing Receivers in an effort to recoup what little assets or funds may be remaining for the benefit of investors. It appears that in each of the fraudulent Ponzi schemes sold to the Fieldgroves, there is little, if anything, to be collected and returned.

6.      In addition to Lawrence, Pope, and CapWest, who were directly involved in the sale of the fraudulent and unsuitable DPP Investments to the Fieldgroves, Defendants in this action include others involved in the sale of the DPP Investments, their controlling persons, and certain officers and directors. The Fieldgroves seek recovery of their investment losses, together with interest, costs, and attorney's fees incurred in bringing this action.

## JURISDICTION AND VENUE

7.      The subject matter jurisdiction of this Court over this action is based upon 15 U.S.C. § 78aa, 28 U.S.C. §1331, and 28 U.S.C. § 1367.

8.      This Court has personal jurisdiction over each of the Defendants pursuant to, *inter alia*, 15 U.S.C. § 78aa and W.S. 1997 § 5-1-107.

9.      Venue over this action is proper in this District pursuant to, *inter alia*, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

## THE PARTIES

### The Plaintiffs:

10.      Russell C. Fieldgrove and Mary Jane Fieldgrove are currently, and were at all

4

times relevant to the allegations contained in this Complaint, residents of the State of Wyoming, maintaining a principal place of residence in Sheridan, Wyoming.

11. The Cecil H. Fieldgrove Trust, Cecil H. Fieldgrove Trustee, is a Wyoming trust situated in Buffalo, Wyoming. Cecil H. Fieldgrove is the Settlor and sole Trustee and during his lifetime, the sole beneficiary of the Cecil H. Fieldgrove Trust.

**The Defendants**

12. Dennis R. Lawrence is a certified public accountant residing in or around Buffalo, Wyoming, who maintains a principal business in Buffalo, Wyoming. From approximately October of 2006 through April of 2007, Lawrence provided professional accounting services to Rusty and Mary Jane Fieldgrove. In addition, Lawrence provided investment advice, made investment recommendations, and offered and sold securities, as further described herein, to the Fieldgroves. Lawrence held himself out to be not only a professional accountant, but a professional knowledgeable and sophisticated in financial and investment matters, qualified to give investment advice and make investment recommendations to the Fieldgroves and others.

13. Randall Pope is an individual residing in and maintaining a principal place of business in Fort Collins, Colorado. At all times material to the allegations of this Complaint, Pope was a registered representative employed by Defendant CapWest and licensed, pursuant to the Financial Industry Regulatory Authority ("FINRA"), federal law and Wyoming state law, to offer and sell securities in the State of Wyoming and other states. Pope, along with Lawrence and others, as set forth in this Complaint, offered and sold securities to the Fieldgroves.

14. CapWest Securities, Inc. is a Colorado corporation maintaining a principal place of business in Lakewood, Colorado. CapWest maintains other offices throughout the United

5

States. CapWest is a broker-dealer licensed by FINRA and in various states, including the State of Wyoming, to offer and sell securities to the public. The securities sold to the Fieldgroves were sold by and through CapWest.

15. Capstone Financial Group, Inc. ("Capstone") is a Nevada corporation with its principal place of business, the same as CapWest, in Lakewood, Colorado. According to CapWest's report on file with FINRA, Capstone directly owns seventy-five percent or more of CapWest and directs the management and policies of CapWest.

16. Colorado Capital Holdings, LLC ("Colorado Capital") is a Nevada limited liability company maintaining a principal place of business in Greeley, Colorado. According to the report of CapWest on file with FINRA, Colorado Capital indirectly, through Capstone, owns seventy-five percent or more of CapWest and directs the management and policies of CapWest.

17. Dale Keith Hall ("Hall") is an individual residing in the State of Colorado and maintaining principal places of business in Lakewood, Colorado and/or Greeley, Colorado. Hall is the CEO, President, Treasurer, CFO, and a director of CapWest and directly and/or indirectly individually and through Capstone and Colorado Holdings directs the management and policies of CapWest. Hall is also a member of the Board of Directors of Capstone and a co-manager of Colorado Capital.

18. Debra Harrawood White ("White") is an individual residing in the State of Colorado and maintaining a principal place of business in Greeley, Colorado. From on or about October 1993 to December 2007, White was the President and a director of CapWest and directly and/or indirectly individually and through Capstone directed the management and policies of CapWest during such period of time. From on or about January 1 through the

6

present, White has served as a consultant to CapWest and maintains at least a sixteen percent ownership interest either directly and/or indirectly in CapWest.

19. Direct Capital Securities, Inc. ("Direct Capital") is a Delaware corporation maintaining a principal place of business in Austin, Texas. Direct Capital is a broker-dealer licensed and registered, pursuant to FINRA, federal law, and Wyoming state law, as well as the laws of other states, to offer and sell securities to the public. Direct Capital served as the "managing broker-dealer" and/or a broker-dealer of the Striker Debenture Offerings, as further described in this Complaint.

20. TIC Capital Markets, Inc. ("TIC Capital") is a Delaware corporation maintaining a principal place of business in the State of Texas. According to the report of Direct Capital on file with FINRA, TIC Capital directly owns seventy-five percent or more of Direct Capital and directs the management and policies of Direct Capital.

21. Pacific Security Income Partners, LP ("Pacific Security Partners") is a Texas limited partnership maintaining a principal place of business in Austin, Texas. According to the report of Direct Capital on file with FINRA, Pacific Security Partners, through TIC Capital, is an owner of Direct Capital and directs the management and policy of Direct Capital.

22. Clay Harriss Womack ("Womack") is an individual who resides in, and maintains principal places of business in Austin, Texas. At all time relevant to the events alleged in this Complaint, Womack was an officer and director of Direct Capital. At all times relevant to the allegations of this Complaint, Womack was and/or currently is the Chairman and Chief Executive Officer of Direct Capital, TIC Capital, and Pacific Security Group, Inc., a forfeited Texas corporation, and individually and through TIC Capital and Pacific Security Group, Inc.,

directs the management and policies of Direct Capital. Further, at all times relevant to the allegations of this Complaint, Womack was a general securities principal with Direct Capital.

23.    Pacific Security Group, Inc. ("Pacific Security") is a forfeited Texas corporation. According to the report of Direct Capital filed with FINRA, Pacific Security is an owner of Direct Capital and directs the management and policies of Direct Capital.

24.    Personal Money Management, LLC ("Personal Money Management") is a Colorado limited liability company maintaining a principal place of business in Fort Collins, Colorado. Personal Money Management is the entity through which Pope conducts business and transactions, including sales of the DPP Investments to the Fieldgroves which are the subject matter of this Complaint.

25.    Steve Holmes ("Holmes") is an individual residing in and maintaining a principal place of business in the Dallas, Texas metropolitan area. At certain times relevant to the allegations contained in this Complaint, Holmes was the Vice President, general counsel, Chief Operating Officer and/or outside legal counsel of Striker Petroleum, LLC, the promoter of the Striker Debentures sold to the Fieldgroves and purportedly the "independent third party trustee" for the Debenture holders of the Striker Debentures sold to the Fieldgroves.

26.    Richard Hancock ("Hancock") is an individual who at all times relevant to the allegations of this Complaint resided in the Tulsa, Oklahoma area. At all times relevant to the allegations contained in this Complaint, Hancock served as the Chief Financial Officer of Striker Petroleum, LLC, the promoter of the Striker Debentures sold to the Fieldgroves and, thus, was intimately familiar with the financial affairs of Striker Petroleum, LLC, and other affiliated and

8

related entities of Striker Petroleum, LLC, in which securities consisting of the Striker Debentures were sold to the Fieldgroves.

## THE FRAUDULENT SCHEMES

27.      The Fieldgroves, along with numerous other investors throughout the country, were the victims of two separate fraudulent Ponzi schemes described in further detail in the paragraphs below. Certain of the Defendants, as described in this Complaint, offered and sold the fraudulent Ponzi scheme investments to the Fieldgroves, while other of the Defendants were either additional direct or indirect  perpetrators of the fraud or aided and abetted the perpetrators of the fraudulent Ponzi schemes. The Fieldgroves were induced to invest an aggregate of $1,140,000.00 into the two fraudulent Ponzi schemes and have suffered a total loss of such amount.

## Striker Petroleum, LLC

28.      Striker Petroleum, LLC ("Striker") is a Texas limited liability company with its principal place of business in Dallas, Texas. From July, 2005 to September, 2006, Striker conducted three tax advantaged oil and gas offerings (the "Legacy Offerings") selling over $60,000,000.00 of undivided working interests in purported producing oil and gas properties. These Legacy Offering investments were sold through a nationwide network of broker-dealers utilizing private placement memoranda and brochures created by Striker. Although the Legacy Offerings initially achieved the projected returns and Striker was able to pay to investors the projected returns, production soon fell off and Striker was unable to make the promised returns to investors in the Legacy Offerings.

29.      In mid-2006, at the suggestion of Pope, who had been involved in the Legacy

9

Offerings, Striker decided to raise capital by offering Debentures.  Commencing on September 18, 2006, and continuing through September of 2008, through a series of five Debenture Offerings entitled "Series A," "Series B," "Series B-2," "Series B-3," and "Series B-4" (the "Debenture Offerings") Striker raised an aggregate of approximately $57,000,000.00 from approximately 540 investors nationwide.  Striker offered its Debentures through many of the same broker-dealers that sold the Legacy Offerings, again using private placement memoranda and brochures (the "Striker Offering Documents").  The Striker Offering Documents of the Debenture Offerings falsely represented that:

    a.  The proceeds from each Debenture Offering would be used primarily to acquire, develop, and operate oil and gas properties and for working capital,

    b.  The Debentures would be collateralized by the oil and gas properties acquired in an amount twice that of the purchase price of the Striker Debentures; and

    c.  The Debenture holders would receive a stated return from such activities.

    30.    Rather than using the proceeds from the sale of the Striker Debentures as stated in the private placement memoranda, Striker used substantial amounts of the proceeds to pay promised returns to investors in prior offerings, including the Legacy Offerings, and in prior Debenture Offerings, thus creating a fraudulent Ponzi scheme in which new investor money was used to pay promised returns to older investors.  As the result of proceeds being used for purposes other than acquiring oil and gas properties, the debentures were not collateralized by acquired properties in an amount twice that of the purchase price of the Striker Debentures. Further, any return which Debenture holders received was at least in part from the proceeds of

subsequent Debenture sales rather than from the purposes stated in the private placement memoranda.

31.     Rusty and Mary Jane Fieldgrove purchased $300,000.00 of Striker Debentures in the Series B Debenture Offering on or about December 21, 2006.  The C. Fieldgrove Trust purchased $400,000.00 of Striker Debentures in the Series B Debenture Offering on or about December 21, 2006.  On or about June 22, 2007, the C. Fieldgrove Trust purchased $90,000.00 of Striker Debentures in the Series B-2 Debenture Offering.   The private placement memorandum for the Series B and B-2 Debenture Offerings, as well as all other Debenture Offerings, were false and misleading in numerous respects as alleged above and in greater detail below.

32.     An aggregate of $11,500,000.00 was raised in the Series B Debenture Offering and an aggregate of $12,500,000.00 was raised in the Series B-2 Debenture Offering.  The private placement memorandum told purchasers of the Series B and B-2 Debentures that approximately ninety percent of the money raised would be used for the acquisition of properties, drilling oil and gas wells, completing oil and gas wells, and working capital when, in fact, substantial proceeds were used to pay returns to prior investors.  Further, the private placement memorandum told purchasers of Series B and Series B-2 Debentures that the Debentures purchased would be collateralized with oil and gas properties when, in fact, the Debentures were not collateralized to the extent represented.  The purchasers of Debentures in the Series B and Series B-2 Offerings were not told that significant portions of the proceeds would be used to pay fixed return payments to investors in the Legacy Offerings and interest payments to prior Debenture holders.  The exact amount of payments from the purchasers of

Series B and Series B-2 Debentures used to make payments to Legacy Offerings investors and prior Debenture holders is unknown, but it is believed to be millions of dollars.

33.     The Offering Documents for the Series B and Series B-2 Debentures, as well as the other series of Debentures, contained unaudited financial statements.  These unaudited financial statements, and in particular the unaudited financial statements for the Series B and Series B-2 Debentures, significantly overstated the assets and earnings of the promoter, Striker. In the Series B Debenture Offering, the assets of Striker were inflated by approximately 47.6 million dollars.  In the Series B-2 Debenture Offering, the assets of Striker were inflated by approximately 34.7 million dollars.  The revenues of Striker were also inflated by including as revenue the amounts raised from the Legacy Offerings thereby obscuring the fact that Striker was losing money on an operating basis.

34.     The private placement memorandum for the Series B and Series B-2 Offerings, as well as the other Debenture Offerings, falsely represented that the Debentures would be collateralized by oil and gas properties and that Striker would appoint an "independent third party trustee" to hold legal title to the collateral for the benefit of the Debenture holders.  The trustee would have various powers, the most important of which was the right to engage in a non-judicial foreclosure of collateral in case of default by Striker.     Contrary to the representations in the private placement memorandum for the Series B and Series B-2 Debenture Offerings, the trustee for the Debenture collateral was not an independent third party, but instead was Holmes, who at various times relevant to the allegations of this Complaint was the Vice President, general counsel, Chief Operating Officer, and/or outside legal counsel, and was neither independent nor a third party.  Soon after Striker failed to make the Debenture payments

12

in December of 2008, Holmes resigned as trustee, claiming he never considered himself a true "trustee" for the Debenture holders as he had no fiduciary duty or actual control and possession of the collateral.

35.     As a result of the foregoing, and other fraudulent activities, on or about December 3, 2009, the SEC filed a Complaint in the case known as *Securities and Exchange Commission v. Striker Petroleum, LLC*, Case No. 3:09-cv-02304-D, United States District Court for the Northern District of Texas (the "Striker Litigation").  On December 3, 2009, the United States District Court for the Northern District of Texas in the Striker Litigation entered an Agreed Order Appointing Receiver in which the Court appointed a Receiver for Striker.  The Agreed Order Appointing Receiver enjoins litigation or other proceedings against the Receiver, the Defendants in the Striker Litigation, the Receivership Estate, and any agent, officer or employee related to the Receivership Estate.  After writing to and speaking with the Receiver in the Striker Litigation, it is believed that the claims brought against the Defendants in this case do not violate such injunction.

**The Medical Capital Holdings, Inc. Offerings**

36.     Medical Capital Holdings, Inc. ("Med Cap"), its subsidiaries, affiliates, and controlling persons raised, through a series of offerings of securities consisting of promissory notes ("Notes"), to the public, between approximately June of 2004 and March of 2009, approximately $1,700,000.00.  The series of offerings were through entities known as Medical Provider Funding I through VI. Each of the Medical Provider Funding corporations (hereinafter referred to as "MP") and each specific Medical Provider Funding corporation (hereinafter referred to as MP with the designated roman numeral) raised money through the sale of

securities consisting of Notes for the purported purpose of acquiring accounts receivable from health care providers and the making of secured loans to health care providers and facilities. Each MP entity sold the Notes through use of a private placement memoranda which described the terms of the Note, the nature of and limitations on the loans and investments to be made with the proceeds, and the policies and procedures for the payment of fees to the trustees and administrators of the MP entities. In the case of MP I, II, IV and VI, the trustee is Bank of New York Mellon, and in the case of MP III and V, the trustee is Wells Fargo Bank.

37.     Although loans and investments were made to and with health care providers, substantial amounts of the proceeds from the sale of the Notes were used to:   (a) pay administrative fees to the promoters contrary to the provisions of the disclosures in the private placement memoranda and the terms of the Note Issuance and Security Agreements between the MP entities and the trustee; (b) purchase non healthcare related assets and engage in transactions contrary to the disclosures contained in the private placement memoranda, and (c) through a practice known as "round tripping" engage in a fraudulent Ponzi scheme by using the proceeds raised in the later MP entity offerings to pay returns to Note purchasers in the earlier MP entity offerings.

38.     On July 16, 2009, the SEC filed the case of *Securities and Exchange Commission v. Medical Capital Holdings, Inc., et al*, Case No. SA CV09-818 DOC (RNBX), United States District Court for the Central District of California (the "Med Cap Litigation"). In July of 2009, the United States District Court for the Central District of California entered a Temporary Restraining Order, and Orders:  (1) freezing assets; (2) appointing a temporary Receiver; (3) prohibiting the destruction of documents; and (4) requiring accountings and order to show cause

re preliminary injunction and appointment of a permanent Receiver (the "Original Order").  The Original Order was later vacated and then re-entered on August 3, 2009.

39.     On or about December 21, 2006, Rusty and Mary Jane Fieldgrove purchased from MP IV for $150,000.00, a Series 1 Class C Note.  On or about December 21, 2006, the C. Fieldgrove Trust purchased from MP IV for $200,000.00, a Series 1, Class C Note.  MP IV offered Notes in two series, and from the sale of Notes from the two series raised approximately $407,000,000.00.  Contrary to representations contained in the private placement memorandum and the provisions of the Note Issuance and Security Agreement between MP IV and Bank of New York Mellon, Med Cap, and subsidiaries and affiliates, improperly took administrative fees of approximately $56,565,000.00.

40.     Contrary to the representations contained in the private placement memorandum of MP IV, MP IV invested approximately $20,000,000.00 in The Perfect Game, LLC, a Nevada limited liability company, whose primary assets are the rights to a film entitled "The Perfect Game."

41.     With the improperly taken administrative fees, Med Cap, its subsidiaries and/or affiliates purchased a yacht of approximately 120 feet for approximately $5,000,000.00.

42.     Med Cap, its subsidiaries and affiliates used a practice known as round tripping to effectively operate a fraudulent Ponzi scheme with the various MP entities.  Round tripping is the practice of one entity selling to another related entity an asset at an improper markup.  In the case of Med Cap, medical receivables from earlier MP entities were marked up and resold multiple times to subsequent MP entities at ever increasing prices while, in reality, the value of the receivables being sold was actually decreasing as the receivables aged.  None of the MP

entities were receiving returns sufficient to pay promised returns to investors and thus used the proceeds from the round tripping transactions to pay Note purchasers in the earlier MP entities with proceeds from investors in the later MP entities.

43.     For example, in May of 2004, MP I bought account receivables of Total Family Care from Carlmont Capital II for $2,539,619.00. In August of 2007, MP IV bought the account receivables from MP I for $3,840,945.00. However, from May of 2004 through August of 2007 there had been no collections upon such receivables. In August of 2008, MP VI bought the same receivable from MP IV for $4,402,587.00 even though there were apparently no collections between August of 2007 and August of 2008 upon such receivables.

44.     Med Cap, and its subsidiaries and affiliates failed to follow procedures set forth in the private placement memoranda, improperly writing up the value of assets so as to fraudulently obtain administrative fees from MP IV and the other MP entities.

45.     The Temporary Restraining Order Appointing Receiver contains a provision staying litigation against the defendants in the Med Cap Litigation and certain related entities, including the MP entities. After speaking with and writing to counsel for the Receiver, it is believed that the bringing of this action against the Defendants named herein does not violate the Stay Order of the United States District Court for the Central District of California.

### THE FIELDGROVES' PURCHASES

46.     In each of the offerings described above, in order to purchase the offered investment, the purchaser must be what is referred to as an "accredited investor." Pursuant to 17 C.F.R. § 230.501(b) an "accredited investor" is an individual or entity who meets certain minimum financial criteria. Rusty and Mary Jane Fieldgrove were not accredited investors.

Defendants Lawrence and Pope knew Rusty and Mary Jane Fieldgrove were not accredited

investors, however, in recommending, advising, inducing and selling to Rusty and Mary Jane

Fieldgrove the DPP Investments, Lawrence and Pope instructed Rusty and Mary Jane Fieldgrove

to claim they were, in fact, accredited investors, and falsely completed the documents and

agreements required for Rusty and Mary Jane Fieldgrove to purchase the DPP Investments in a

false and misleading manner, falsely portraying Rusty and Mary Jane Fieldgrove as accredited

investors.  Rusty and Mary Jane Fieldgrove purchased the following investments on or about the

following dates and in the following amounts:

| Date | Investment | Amount of Investment |
|------|------------|---------------------|
| Dec. 21, 2006 | Striker Petroleum, LLC Series B Debentures | $300,000.00 |
| Dec. 21, 2006 | MP IV Promissory Note | $150,000.00 |
| | TOTAL | $450,000.00 |

47.     The C. Fieldgrove Trust purchased the following investments on or about the

following dates and in the following amounts:

| Date | Investment | Amount of Investment |
|------|------------|---------------------|
| Dec. 21, 2006 | Striker Petroleum, LLC Series B Debentures | $400,000.00 |
| Dec. 21, 2006 | MP IV Promissory Note | $200,000.00 |
| June 22, 2007 | Striker Petroleum, LLC Series B-2 Debentures | $ 90,000.00 |
| | TOTAL | $690,000.00 |

48.     Mary Jane Fieldgrove worked as a bookkeeper for Lawrence from approximately

2000 through 2006.  As a result, Rusty and Mary Jane Fieldgrove came to look upon Lawrence

as a financial advisor, particularly with respect to his financial advice concerning the sale of their

interest in a ranch and his investment recommendations and advice concerning the proceeds from the ranch sale.

49.     For example, with respect to the ranch sale proceeds, Lawrence advised Rusty and Mary Jane Fieldgrove not to effectuate a 1031 exchange with respect to their interest in the ranch but to instead pay the required income taxes. Lawrence then created and gave to Rusty and Mary Jane Fieldgrove a chart which recommended investing the after-tax proceeds in Striker Debentures and MP IV Notes. This chart illustrated that the purported returns from Striker Debentures and MP IV Notes would in short time repay Rusty and Mary Jane Fieldgrove the income taxes paid upon the sale of the ranch plus generate significant additional returns.

50.     During late November and/or early December, 2006, Rusty and Mary Jane Fieldgrove had one or more short informal meetings with Lawrence, at his office, during which Lawrence recommended to Rusty and Mary Jane Fieldgrove their purchase of Striker Debentures and MP IV Notes.

51.     On or about December 15, 2006, at Lawrence's office, Mary Jane Fieldgrove, Lawrence, Pope, C. Fieldgrove, and Ryan Fieldgrove (C. Fieldgrove's son) met for the purpose of Lawrence and Pope offering and selling to the Fieldgroves Striker Debentures and MP IV Notes.

52.     At the December 15, 2006 meeting, Pope and/or Lawrence made to the Fieldgroves the following material misrepresentations of fact:

       a. The Fieldgroves would receive a thirteen percent annual return on their investment in Striker Debentures;

b.  The Fieldgroves would receive a 9.75 percent annual return upon their purchase of MP IV Notes;

c.  An investment by the Fieldgroves in Striker Debentures would be collateralized with land and oil and gas mineral rights well in excess of the Fieldgroves' investment amounts;

d.  The oil and gas interests to be purchased with the proceeds in the Fieldgroves' purchase of Striker Debentures, together with other investors' money, was purchasing interests in the highest producing oil and gas field in the State of Texas;

e.  Striker was going to "go public" and the Fieldgroves would receive their money back plus a profit upon their Striker Debentures;

f.  The worst case scenario for the Fieldgroves in the purchase of Striker Debentures was that they would either be paid back in stock when Striker went public or they would get paid from collateral securing the debentures; and

g.  The most likely way in which the Fieldgroves would receive a profit on their purchase of Striker Debentures was by Striker going public, and the Fieldgroves receiving stock which could be publicly traded and the Fieldgroves sale of such stock.

53.    The statements made by Pope and/or Lawrence to the Fieldgroves at the December 15, 2006 meeting in the immediately preceding paragraph were false and misleading for the following reasons:

a.  Any return on an investment in Striker Debentures was dependent upon the continuance of a fraudulent scheme and although for a limited period of time the Fieldgroves received a thirteen percent annual return on their investment, ultimately they did not;

b.  An annual return upon the MP IV Notes was dependent upon the continuation of a fraudulent Ponzi scheme and although the Fieldgroves received a 9.75 percent annual return upon the MP IV Notes for a limited period of time, ultimately they did not receive such annual return;

c.  Significant amounts of the money raised from the sale of the Striker Debentures were used for purposes other than the purchase of oil and gas rights which were to serve as collateral for the Debentures and thus the Debentures were not collateralized to the extent and in the amounts represented in the Private Placement Memorandum;

d.  Significant amounts of the proceeds from the sale of Striker Debentures were used for purposes other than the purchase of oil and gas interests and based upon the lack of actual returns from oil and gas properties, it is unlikely the oil and gas properties purchased were in the highest producing fields in the State of Texas; and

e.  Striker never "went public" and to the extent statements and/or representations were made regarding returns and profits based upon Striker "going public" such statements were false.  Further, such statements do not qualify as "forward looking statements" because they were made without a reasonable basis and/or adequate due diligence for the making of such statements.

54.    At the December 15, 2006 meeting, Pope represented to the Fieldgroves that he had recently been to the offices of Striker and met with its President and CEO Mark Roberts. Pope represented he had assisted Roberts in putting together and/or structuring Striker's Debenture Offering and led the Fieldgroves to believe that Pope had performed a thorough and adequate due diligence of Striker, possessed superior knowledge of Striker and its business

dealings and operations, and that Striker Debentures was an extremely safe and secure investment, suitable for the Fieldgroves' investment of a substantial amount of their net worth. Although Pope may have visited Striker's offices, Pope did not perform an adequate and thorough due diligence of Striker and therefore lacked a good faith basis for the foregoing representations. Further, Striker Debentures was not an extremely safe and secure investment, suitable for the Fieldgroves' investment of a substantial amount of their net worth.

55. Lawrence and Pope failed to perform adequate due diligence before recommending, advising, and offering to the Fieldgroves the Striker Debentures. As a result, Lawrence and Pope omitted to disclose to the Fieldgroves numerous material facts, including that the Striker Debenture offerings were part of a fraudulent Ponzi scheme operated by its promoter, Striker, with proceeds from the purchase of the Debentures being used to pay purchasers in the Legacy Offerings and prior Debenture Offerings of Striker.

56. During the December 15, 2006 meeting, Pope and/or Lawrence represented to the Fieldgroves that Med Cap had been in operation for over thirteen years and that previous purchasers of notes of Med Cap were so satisfied that when the notes became due, they would routinely roll them over, rather than accepting payment upon maturity. As with the Striker Debentures, Pope and Lawrence represented to the Fieldgroves that the Med Cap offering was very conservative, safe, and secure, and suitable for the Fieldgroves to invest a substantial amount of their net worth in MP IV Notes. The statements of Pope and Lawrence were misleading because Med Cap was a fraudulent Ponzi scheme, not a very conservative, safe, secure, and suitable investment for the Fieldgroves.

57.     Lawrence and Pope failed to perform adequate due diligence in recommending to the Fieldgroves the MP IV Notes.  As a result, Lawrence and Pope omitted to disclose to the Fieldgroves numerous material facts, including that the MP IV Notes were part of a fraudulent Ponzi scheme operated by its promoter, Med Cap, with proceeds from the purchase of MP IV Notes being used to pay purchasers in prior note offerings.

58.     In offering the Striker Debentures to the Fieldgroves, Lawrence and Pope omitted to disclose material facts to the Fieldgroves, including but not limited to:

a.     That, in fact, the Debentures were not collateralized in excess of the Fieldgroves' investment amounts when aggregated with other purchasers of Striker Debentures;

b.     The risks of the lack of audited financial statements of Striker, the Legacy Offerings entities, and the prior Debenture Offerings;

c.     That money among the various Debenture Offerings was being comingled, with new investor money being used to pay promised returns to older investors;

d.     That the Striker Debentures were illiquid and in the event of a cash need, most likely the Fieldgroves would not be able to liquidate or sell the Striker Debentures as there was no market for the Striker Debentures; and

e.     That the Striker Debentures were high risk investments suitable only for those who could afford an entire loss of the investment.

59.     In offering the MP IV Notes to the Fieldgroves, Lawrence and Pope omitted to disclose material facts to the Fieldgroves, including but not limited to:

a.     That Med Cap, its subsidiaries and affiliates engaged in the fraudulent practice of "round tripping;

b.   The risks of the lack of audited financial statements of MP IV, Med Cap, and the prior Med Cap offerings;

c.   That the MP IV Notes were illiquid and in the event of a cash need, most likely the Fieldgroves would not be able to liquidate or sell the MP IV Notes as there was no market for the MP IV Notes;

d.   That money among the various Med Cap note offerings was being comingled, with new investor money being used to pay promised returns to older investors; and

e.   That the MP IV Notes were high risk investments suitable only for those who could afford an entire loss of the investment.

60.   During the December 15, 2006 meeting, or shortly before such meeting, Lawrence and/or Pope gave to Mary Jane Fieldgrove and to Cecil Fieldgrove a private placement memorandum for the Striker Debenture Series B Offering, subscription agreements and documents for the Striker Debenture Series B Offering, a private placement memorandum for the MP IV Notes, subscription agreements and documents for the purchase of MP IV Notes, and confidential client application form and related forms of CapWest.

61.   The private placement memorandum of the Striker Debenture Series B Offering contained material misrepresentations of fact, as set forth above and additionally, including but not limited to:

a.   The amount of the proceeds which would be used to purchase oil and gas properties. In fact, far less than the represented amount was used to purchase oil and gas properties. Instead, substantial amounts of the offering proceeds were utilized to pay promised returns to purchasers in the Legacy Offerings and prior Debenture Offerings.

b.  That the proceeds from the purchase of Striker Debenture Series B would be utilized primarily for the purchase of oil and gas properties which would then generate the promised return to such debenture purchasers.  In fact, proceeds from the Series B Debenture Offering were used to pay investors in the Legacy Offerings and prior Debenture Offerings and returns to purchasers of Series B Debentures would not and did not derive from returns upon oil and gas properties purchased.

c.  That there existed an independent third party trustee for the Series B debenture holders when, in fact, there was not an independent third party trustee for the debenture holders.

d.  That the assets of Striker were as represented in the unaudited financial statements accompanying the memorandum when, in fact, the assets were significantly overstated.

e.  That the revenue of Striker was as represented in the unaudited financial statements accompanying the private placement memorandum when, in fact, the revenue was significantly overstated.

62.  The private placement memorandum of the Series B Striker Debentures omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to:

a.  The risks of the lack of audited financial statements of Striker and its prior offerings, including the Legacy Offerings and prior Debenture Offerings, such risks including:

i.  That offering proceeds from prior offerings had been used for purposes other than as stated therein;

ii.  That assets of Striker may be overstated;

iii.  That revenues of Striker may be overstated; and

iv.  That offering proceeds may be used to pay promised returns to investors in prior offerings, including the Legacy Offerings and prior Debenture Offerings, thus permitting the operation of a fraudulent Ponzi scheme.

b.  That the purported trustee for the debentures purchased by the Fieldgroves, Holmes, was, in fact, not an "independent third party trustee" but the Vice President, general counsel and/or outside legal counsel for Striker; and

c.  That although Striker purported to have positive operating revenues, it was, in fact, operating at a loss.

63.    The private placement memorandum of MP IV contained untrue statements of material fact, as set forth above and additionally, including but not limited to:

a.  That administrative fees would only be taken in accordance with the provisions of the private placement memorandum when, in fact, administrative fees were taken contrary to such provisions;

b.  That the proceeds from the offering would be used to purchase medical receivables and other health care related assets when, in fact, substantial amounts of the proceeds were used for other purposes, including the payment of promised returns to investors in prior offerings; and

c.  That medical receivables and other health care assets would be purchased in arms length transactions at fair and reasonable prices when, in fact, practices such as round tripping of medical receivables at ever increasing prices, while the receivables were decreasing in value, was a common practice.

64.    The MP IV private placement memorandum omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to:

a.   That MP IV was part of a fraudulent Ponzi scheme operated by Med Cap and its subsidiaries and affiliates in which the proceeds from later investors were used to pay promised returns to investors in earlier offerings;

b.   The amount of offering proceeds which would be used to pay administrative fees;

c.   The risks of the lack of audited financial statements of Med Cap and the prior offerings which risks included:

i.   That investor money from MP IV would be comingled with investor money in other offerings;

ii.   That investor money in MP IV would be used to pay promised returns to investors in prior offerings of Med Cap, its subsidiaries and affiliates;

iii.   The practice of round tripping; and

iv.   That non medical receivables and health care assets would be acquired with the proceeds of the MP IV offering money.

65.    On or about December 21, 2006, Rusty and Mary Jane Fieldgrove returned to Lawrence's office with the CapWest Confidential Account Application form, the CapWest Direct Participation/REIT Suitability and Order Transmittal form, and the Subscription Agreement and documents for the Series B Striker Debentures, and the Subscription Agreement and documents for the MP IV Notes. Based upon the representations of Lawrence and Pope, the representations contained in the private placement memorandum of the Series B Striker

Debentures and the MP IV Notes, they were interested in making both investments. Rusty and Mary Jane Fieldgrove sought Lawrence's advice on how to make the investments. Lawrence took the Confidential Account Application form of CapWest, the Direct Participation/REIT Suitability and Order Transmittal form of CapWest, and the Subscription Agreements for the Series B Striker Debentures and MP IV Notes and completed such documents so as to falsely represent that the Fieldgroves were accredited investors.

66. In particular, on the Confidential Account Application form, Lawrence falsely stated on such form:

a. That Rusty and Mary Jane Fieldgrove's investment knowledge was moderate when, in fact, it was novice;

b. That Rusty and Mary Jane Fieldgrove had twelve years of investment experience in stocks and mutual funds when, in fact, they had none;

c. Rusty and Mary Jane Fieldgrove had a net worth inclusive of home, furnishings and auto of $1,176,316.00 when, in fact, their net worth was slightly in excess of $450,000.00; and

d. That Rusty and Mary Jane Fieldgrove had a net worth exclusive of home, furnishings and auto of $1,141,316.00 when, in fact, their net worth was slightly in excess of $450,000.00.

67. The investment of Rusty and Mary Jane Fieldgrove in the Striker Series B Debentures was accepted on or about January 2, 2007 on behalf of Striker, by Holmes as Vice President.

68.     Lawrence falsely completed the CapWest Direct Participation Program/REIT Suitability and Order Transmittal form misrepresenting the assets and net worth of Rusty and Mary Jane Fieldgrove.

69.     Lawrence falsely completed the Subscription Agreement and related documents for the purchase of the Series B Striker Debentures by Rusty and Mary Jane Fieldgrove by representing the net worth of Rusty and Mary Jane Fieldgrove to be $1,176,316 when, in fact, it was approximately $450,000.00.

70.     Lawrence falsely completed the Subscription Agreement and related documents for the purchase of the MP IV Notes by Rusty and Mary Jane Fieldgrove by representing the net worth of Rusty and Mary Jane Fieldgrove was in excess of $1,000,000.00 when, in fact, it was approximately $450,000.00.

71.     By the time Lawrence and Pope had offered and sold the above-described DPP Investments to Rusty and Mary Jane Fieldgrove, they had caused them to place virtually all of their assets into DPP Investments which are investments in privately held entities, meaning they are non-liquid and subject to significant risk of loss. The DPP Investments individually and, in particular, as a whole were unsuitable for Rusty and Mary Jane Fieldgrove in view of Rusty and Mary Jane Fieldgrove's risk tolerance, time horizon, investment knowledge, investment experience, income needs, and liquidity needs.

72.     Rather than advising diversification of their investments, Lawrence and Pope advised and recommended concentrating Rusty and Mary Jane Fieldgrove's assets in a single type of investment, i.e. private, illiquid, high risk, direct participation programs, with approximately sixty-six percent of those investments concentrated in oil and gas.     Such

investment advice and recommendation was entirely unsuitable for Rusty and Mary Jane Fieldgrove.

73.    The DPP Investments were particularly unsuitable for Rusty and Mary Jane Fieldgrove because the terms and conditions of each of the DPP Investments which were offered and sold to Rusty and Mary Jane Fieldgrove by Lawrence and Pope were only suitable for accredited investors and Rusty and Mary Jane Fieldgrove were not accredited investors. Lawrence and Pope knew Rusty and Mary Jane Fieldgrove were not accredited investors and falsified documents for Rusty and Mary Jane Fieldgrove in such a manner as to disguise the fact that Rusty and Mary Jane Fieldgrove were not accredited investors.

74.    As a direct and proximate result of the representations made to C. Fieldgrove in the December 15, 2006 meeting and the representations contained in the private placement memorandum of the Striker Debenture Series B Offering and the MP IV Notes, and related subscription agreements and documents, and in reliance upon the completeness and accuracy of the representations and disclosures contained in such documents, the C. Fieldgrove Trust made the investments set forth in paragraph 47 above.

75.    On or about the date of the purchase by the C. Fieldgrove Trust of the Striker Series B Debentures in the amount of $400,000.00 and the MP IV Note in the amount of $200,000.00, the net worth of the C. Fieldgrove Trust inclusive of home furnishings and autos was approximately $1,115,000.00, while the net worth of the C. Fieldgrove Trust exclusive of home furnishings and autos was approximately $800,000.00. As a direct and proximate result of the solicitation and sale of the Striker Series B Debentures and the MP IV Note to the C. Fieldgrove Trust on or about December 20 and 21, 2006, Lawrence and Pope caused

29

approximately seventy-five percent of the C. Fieldgrove Trust's net worth, exclusive of home furnishings and autos, to be invested in illiquid high risk DPP Investments which were unsuitable for the C. Fieldgrove Trust in view of its, and its beneficiary's, risk tolerance, time horizon, investment knowledge, investment objectives, investment experience, and age of its beneficiary.

76.     The investment of the C. Fieldgrove Trust in the Striker Series B Debentures was accepted on or about January 2, 2007 on behalf of Striker by Holmes, as Vice President of Striker.

77.     On or about June 22, 2007, in the reliance upon the representations contained in the private placement memorandum for the Striker Series B-2 Debentures provided to C. Fieldgrove by and/or through Pope, and the accuracy and completeness of such representations and disclosures, the C. Fieldgrove Trust purchased $90,000.00 of Striker Series B-2 Debentures.

78.     The private placement memorandum for the Striker Series B-2 Debenture made the same material misrepresentations and omitted to disclose the same material facts as did the private placement memorandum for the Series B Debentures as alleged in paragraphs 61 and 62. The offer and sale of the Series B-2 Debentures to the C. Fieldgrove Trust was unsuitable in view of the C. Fieldgrove Trust's risk tolerance, time horizon, investment knowledge, investment objectives, investment experience, and age of its beneficiary. The offer and sale of the Series B-2 Debentures to the C. Fieldgrove Trust was further unsuitable because as a result of such investment, eighty-six percent of its net worth, exclusive of home furnishings and autos, was invested in illiquid, high risk DPP Investments with approximately seventy percent of such DPP Investments concentrated in oil and gas DPP Investments.

79.     At the time of the above-described investments by the C. Fieldgrove Trust, its beneficiary, Cecil Fieldgrove, was 74 years old.  C. Fieldgrove was unemployed and was solely dependent upon Social Security and returns which could be generated from his net worth, exclusive of the C. Fieldgrove Trust's home, furnishings and autos, which were the home, furnishings and autos in which C. Fieldgrove and his wife, Janice Fieldgrove, resided and used.

80.     Direct Capital was the managing broker-dealer and/or a broker/dealer for the Striker Debenture Offerings and, as such, received two percent of the gross proceeds from the sale of the Striker Debentures, including two percent of the purchases by the Fieldgroves, and, in addition, received a due diligence allowance in the amount of two percent of the gross proceeds of the Series B Striker Debenture Offerings, and a due diligence allowance of one percent of the gross proceeds of the Series B-2 Striker Debentures purchased by the Fieldgroves.

81.     Prior to serving as the Dealer Manager and/or a broker-dealer of the Series B and Series B-2 Striker Debenture Offerings, Direct Capital was either a dealer-manager of, or participated as a broker-dealer in the following Striker offerings:

      a.  Striker Legacy Interests, Amber Property LLC, aggregate offering amount $32,500,000.00;

      b.  Striker Petroleum, LLC, Rework Program 2005, aggregate offering amount $14,200,000.00;

      c.  Striker Legacy Interests CJ Property LLC, aggregate offering amount $15,800,000.00; and

      d.  Striker Petroleum 13% Series A Senior Secured Convertible Debentures, aggregate offering amount $10,900,000.00.

82.     Prior to Direct Capital acting as the dealer-manager for the Series B and Series B-2 Striker Debenture Offerings, Direct Capital had participated in Striker Offerings of an aggregate amount of $73,400,000.00.   These Striker offerings commenced as early as April, 2005, almost two years prior to the Fieldgroves' purchase of the Series B Striker Debentures. One or more of these Striker offerings was part of Striker's fraudulent Ponzi scheme.

83.     As a broker-dealer participating in the offering of securities of Striker, and its subsidiaries and affiliates, and pursuant to rules of the Financial Industry Regulatory Authority ("FINRA") and its predecessor, the National Association of Securities Dealers ("NASD"), Direct Capital had an obligation and a duty to conduct a reasonable due diligence investigation of Striker, and their officers, directors and control persons.

84.     Prior to Direct Capital's participation in the Series B and Series B-2 Debenture Offerings, Direct Capital had ample opportunity to investigate the financial results and operations of the prior Striker offerings, the accuracy and reliability of Striker financial statements, and the actual use of proceeds of the prior Striker offerings in which it had participated to determine whether the proceeds were used as represented.   A reasonable due diligence investigation would include a detailed examination of financial statements of Striker and its affiliates with a particular emphasis on historical use of proceeds and the accuracy and reliability of financial information previously provided.

85.     Prior to the Series B and Series B-2 Debenture Offerings, Striker Petroleum conducted the Striker Petroleum 13% Series A Senior Secured Convertible Debenture Offering in which Direct Capital participated as either the dealer-manager and/or a broker-dealer. Pursuant to the provisions of the Striker Petroleum 13% Series A Senior Secured Convertible

Debentures, an independent third party trustee for the benefit of the Debenture holders was required to be appointed. A reasonable due diligence investigation of Direct Capital with respect to the Series B and Series B-2 Debenture Offerings would include an investigation of whether Striker had appointed an independent third party trustee as represented in the prior offerings in which Direct Capital had participated as a dealer-manager and/or a broker-dealer.

86.     Had Direct Capital performed a reasonable due diligence investigation as required pursuant to FINRA rules it would have discovered:

a. That money used in prior offerings was not being utilized as represented but, instead, was being used to pay promised returns to investors in earlier offerings;

b. That financial information and financial statements contained in prior offerings, as well as in the Series B and Series B-2 Debenture Offerings, were false and inaccurate;

c. That Striker had not appointed an independent third party trustee for the benefit of the Debenture holders as represented in the Private Placement Memoranda but, instead, had appointed Steve Holmes, an officer of Striker and general counsel of Striker; and

d. The debentures in prior Striker offerings was not collateralized as represented in such prior offerings.

87.     Alternatively, Direct Capital did discover through a due diligence investigation or otherwise that:

a. Prior Striker offerings had not utilized proceeds as represented in the Private Placement Memoranda of such prior offerings, but were using such proceeds to pay promised returns to investors in earlier offerings;

b. That the financial data and financial statements contained in the Series B and Series B-2 Debenture Offerings, as well as that financial data and financial statements contained in prior offerings in which Direct Capital participated as a dealer-manager and/or a broker-dealer, were false and inaccurate;

c. That Striker had not and/or was not appointing an independent third party trustee for the Debenture holders, and/or

d. That Striker had not collateralized the Debentures of prior Striker offerings as represented.

With such knowledge, Direct Capital, through acting as a dealer-manager, knowingly disseminated Private Placement Memoranda for the Series B and Series B-2 Debenture Offerings containing material misstatements of fact and omissions to statement facts.

88.     In both the Series B and Series B-2 Debenture Offerings, Direct  Capital either failed to conduct the reasonable due diligence investigation so as to inquire into those matters required in a reasonable due diligence investigation or did inquire into such matters and learned the proceeds were not used as represented, that financial information was false and inaccurate, and/or that an independent third party trustee had not been appointed as represented in prior offerings. In either event, Direct Capital in the offer and sale of the Series B and Series B-2 Debenture Offerings as dealer-manager and/or broker-dealer, disseminated Private Placement Memorandum containing material misrepresentations of fact and omissions to state material facts, pursuant to which Direct Capital received substantial amounts of money.

89.     Direct Capital and Womack each owed a duty to the Fieldgroves, and all other purchasers of the Striker Debentures to conduct a full, complete, thorough, prudent, and

reasonable due diligence investigation (a "Due Diligence Investigation") of the Striker Debenture Offerings, Striker, its subsidiaries, related entities, and officers and directors. In fact, Direct Capital received approximately $1,710,000.00 from the sale of the Series B and Series B-2 Striker Debentures for purportedly performing such a Due Diligence Investigation.

90.    Direct Capital and Womack breached their duty to conduct a Due Diligence Investigation and, in fact, failed to perform a Due Diligence Investigation by, among other things:

a.  Not obtaining reliable financial information concerning the history and operations of Striker;

b.  Not adequately determining the use of proceeds of prior Striker offerings;

c.  Not requiring audited financial statements on Striker, the Legacy Offering entities, and the respective Debenture Offerings;

d.  Not requiring the inclusion in the private placement memoranda disclosure of the risks associated with the lack of audited financial statements and, in particular, the risks that the proceeds from the offerings could be, and in the case of the Striker Debentures were, in fact, used for purposes other than as stated in the private placement memoranda, effectively allowing Striker to operate a fraudulent Ponzi scheme defrauding the Fieldgroves and numerous other investors;

e.  Not determining the existence of an independent third party trustee for the Debenture holders as represented in prior Striker offerings and in the private placement memorandum for the Series B and Series B-2 Striker Debentures; and

35

f. Not ascertaining the lack of adequate collateralization of the Debentures in prior Striker offerings and as represented in the private placement memorandum for the Series B and Series B-2 Striker Debentures.

91. Direct Capital and Womack each owed a duty to the Fieldgroves and all of the purchasers of Striker Debentures to supervise all those engaged in the offer and sale of the Striker Debentures, including CapWest, which were members of the "selling group" for which Direct Capital served as the managing broker-dealer. In fact, Direct Capital received approximately $2,280,000.00 from the sale of Striker Series B and Series B-2 Debentures for acting as the managing broker-dealer for the selling group.

92. Direct Capital and Womack breached their duty to supervise members of the selling group of the Striker Debentures by, among other things:

a. Not having in place adequate compliance and supervisory procedures with oversight provisions so as to prevent the fraudulent conduct engaged in by those involved in the sale of Striker Debentures and further, to reasonably protect against the sale of Striker Debentures to persons and entities unsuitable for such purchase; and

b. Failing to conduct a reasonable or meaningful review of the sales of the Striker Debentures by CapWest so as to protect the Fieldgroves and other purchasers of Striker Debentures from fraudulent conduct in the sale of such Debentures and the sale of such Debentures to persons unsuitable for the purchase of such Debentures, such as the Fieldgroves.

93. CapWest, as a broker-dealer involved in the sale of the Striker Debentures, and Hall, and White each owed the same duty as Direct Capital to conduct a Due Diligence Investigation of the Striker Debenture Offerings prior to their offer and sale to the Fieldgroves

and others. CapWest failed to conduct such a Due Diligence Investigation in the same manner as Direct Capital failed to conduct such a Due Diligence Investigation.

94. CapWest, as the selling broker-dealer of the MP IV Notes, Hall, and White each owed to the Fieldgroves, and all other purchasers of such Notes which it offered and sold, the duty of performing a Due Diligence Investigation with respect to each such offering.

95. In its offer and sale of the MP IV Notes, CapWest, Hall, and White each failed to perform a Due Diligence Investigation by failing, among other things:

a. To obtain reliable financial information of MedCap and of the prior MedCap offering of Notes;

b. To adequately determine the use of proceeds of prior MedCap Note offerings;

c. To require audited financial statements on Med Cap and its prior offerings; and

d. To require the inclusion of risk disclosure in the offering material disclosing the risks associated with not having audited financial statements from Med Cap and its predecessor entities and, in particular, the risk that offering proceeds for previous offerings may not be used as represented and as such, the proceeds from the offering being offered and sold to the Fieldgroves would not be used as represented, but would be used for other purposes, allowing the operation of a fraudulent Ponzi scheme.

96. CapWest, Hall, and White each owed a duty to the Fieldgroves that the DPP Investments offered and sold through its registered representatives be suitable in view of the Fieldgroves' risk tolerance, time horizon, investment knowledge, investment experience, income needs, and liquidity needs. CapWest breached this duty by offering and selling to the Fieldgroves, unsuitable DPP Investments as described herein.

97.    CapWest, as a broker-dealer involved in the sale of the Striker Debentures and the MP IV Notes, Hall, and White each owed a duty to the Fieldgroves and all other purchasers of such DPP Investments to supervise the conduct of its sales representatives, including Pope, and others, involved in the sale of such DPP Investments to the Fieldgroves.

98.    In its offer and sale of the Striker Debentures and MP IV Notes to the Fieldgroves, CapWest, Hall, and White each failed to adequately supervise its registered representative Pope, and others, which it had a duty to supervise by failing, among other things:

a.    To have in place reasonable and adequate compliance and supervisory procedures so as to protect the Fieldgroves and other purchasers of such DPP Investments through CapWest from the fraudulent conduct of Pope as described in this Complaint in the sale of unsuitable investments to the Fieldgroves; and

b.    The failure to follow its compliance and supervisory procedures in its oversight of its registered representative Pope, and others, which resulted in the sale of the DPP Investments described herein to the Fieldgroves in a fraudulent manner and resulted in the sale of unsuitable investments as described herein to the Fieldgroves.

99.    At various times relevant to the allegations contained in this Complaint, Holmes was the Vice President, general counsel, Chief Operating Officer, outside legal counsel of Striker, and/or purported independent third party trustee of the Striker Debentures.  In one or more of such roles on behalf of Striker, Holmes was intimately familiar with the business operations of Striker, its subsidiaries and affiliates, and the manner in which the Legacy Offerings and the Debenture Offerings were conducted and operated.

100.    Although not specifically identified in the private placement memoranda of the

Striker Debenture Offerings as the "independent third party trustee" for the Striker Debentures, Holmes, as general counsel, Vice President, Chief Operating Officer, and/or outside legal counsel, knew that he was to serve as the purported "independent third party trustee" for the Striker Debentures and further knew that he was neither "independent" nor "a third party." Thus, Holmes knew at the time of the Striker Debenture Offerings and, in particular, the Series B and Series B-2 Striker Debenture Offering that the private placement memoranda were false and misleading, containing untrue statements of material fact with respect to the existence of an independent third party trustee for the Series B and Series B-2 Striker Debentures.

101.   As general counsel, Vice President, Chief Operating Officer, and/or outside legal counsel of Striker, and/or as the purported independent third party trustee for the Striker Debenture holders, Holmes was intimately familiar with Striker's manner of operations and knew, or was reckless in not knowing, that Striker was operating a fraudulent Ponzi scheme as has been described in this Complaint.

102.   Holmes owed a duty, as general counsel, Vice President, Chief Operating Officer, and/or outside legal counsel of Striker, and as the purported independent third party trustee for the Striker Debenture holders, to purchasers of Striker Debentures, including Series B and Series B-2 Striker Debentures, to not offer or sell the Striker Debentures through use of private placement memoranda containing untrue statements of material fact and omission to state material facts. Holmes breached this duty to the Fieldgroves, and other Debenture purchasers, by, as general counsel, outside legal counsel, Chief Operating Officer, and/or Vice President for Striker, and/or as the purported independent third party trustee for the Striker Debenture holders,

being a primary and material participant in Striker's fraudulent Ponzi scheme and by aiding and abetting Striker's fraudulent Ponzi scheme.

103.    In the Series B and Series B-2 Striker Debenture Offering, Hancock is identified as the "Chief Financial Officer" of Striker.  As the Chief Financial Officer of Striker, Hancock knew, or if he lacked actual knowledge, was reckless in not knowing, of the operation of Striker's fraudulent Ponzi scheme as described in this Complaint.  As the Chief Financial Officer of Striker, Hancock was a primary actor and material participant, directly and/or indirectly, managing and handling the financial affairs of Striker, the Legacy Offerings, and the Debenture Offerings and their proceeds and revenues.  Thus, not only did Hancock aid and abet Striker's fraudulent Ponzi scheme, but Hancock was a direct participant in Striker's fraudulent Ponzi scheme directly and proximately causing the losses sustained by the Fieldgroves in the investments in the Series B and Series B-2 Striker Debentures.

## FIRST CLAIM FOR RELIEF

### (15 U.S.C. § 78j(b) and C.F.R. § 240b-5)

104.    Paragraphs 1 through 103 of this Complaint are re-alleged and incorporated by reference herein.

### Preliminary Allegations

105.    Each of the Defendants against whom this Claim for Relief is brought is a person as defined by 15 U.S.C. § 78c(a)(9).

106.    Each of the DPP Investments described in this Complaint is a security within the meaning of 15 U.S.C. § 78c(a)(10).

107.    In offering and selling the above-described securities to the Fieldgroves, the Defendants made use of means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, the telephone, the internet, and/or private commercial interstate carriers.

**Striker Debentures**

108.    In offering and selling to the Fieldgroves the Striker Debentures, Lawrence, Pope, Personal Money Management, CapWest, Direct Capital, Holmes, and Hancock employed one or more devices, schemes, and artifices to defraud the Fieldgroves, as set forth hereinabove and additionally, including but not limited to:

a.   Knowingly and/or recklessly failing to conduct a Due Diligence Investigation into Striker and its various offerings and thus failing to warn the Fieldgroves of the existence and/or the possibility that they were investing in a fraudulent Ponzi scheme;

b.   The failure to disclose material facts as set forth herein;

c.   The making of untrue statements of material fact as set forth herein; and

d.   The sale of unsuitable investments to the Fieldgroves in view of the risk tolerance, time horizon, investment knowledge, investment experience, income needs, and liquidity needs of the Fieldgroves, and in the case of the C. Fieldgrove Trust, the age of its beneficiary, all of the foregoing being for the purpose of earning a commission and other forms of compensation upon the sale of the DPP Investments to the Fieldgroves.

109.    In connection with the offer and sale of the Striker Debentures to the Fieldgroves, Lawrence, Pope, Personal Money Management, CapWest, Direct Capital, Holmes, and Hancock

each made untrue statements of material fact to the Fieldgroves as set forth hereinabove and additionally as follows:

a. Lawrence, Pope, and Personal Money Management, through Pope, made the untrue statements in material fact as set forth above;

b. Lawrence, Pope, Personal Money Management, CapWest, Direct Capital, Holmes, and Hancock made untrue statements of material fact through the Striker Debenture Offering private placement memoranda, as set forth above and additionally, including but not limited to:

i. That the proceeds from the purchase of the Debentures would be used as set forth in the private placement memoranda, rather than for other purposes, including but not limited to, the payment of promised returns to investors in the Legacy Offerings and prior Debenture Offerings;

ii. That there existed an independent third party trustee for the Debenture holders when, in fact, there was not an independent third party trustee for the Debenture holders;

iii. That the offering proceeds would be used primarily to acquire, develop, and operate oil and gas properties, and for working capital when, in fact, the proceeds were used for other purposes;

iv. That the assets of Striker were as represented in the unaudited financial statements accompanying the private placement memoranda when, in fact, the assets were significantly overstated; and

v.   That the revenue of Striker was as represented in the unaudited financial statements accompanying the private placement memoranda when, in fact, the revenue was significantly overstated.

110.   In meetings with the Fieldgroves and/or in the Striker Offering Documents, Lawrence, Pope, Personal Money Management, CapWest, Direct Capital, Holmes, and Hancock omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth hereinabove.

111.   Each of Lawrence, Pope, Personal Money Management, CapWest, Direct Capital, Holmes, and Hancock engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Fieldgroves in connection with the purchase and sale of the Striker Debentures by, among other things:

a.   Falsifying the Subscription Agreement of Rusty and Mary Jane Fieldgrove for the purchase of the Striker Debentures and/or failing to conduct any investigation into the accuracy of the representations contained in the Subscription Agreement of Rusty and Mary Jane Fieldgrove;

b.   Recommending and selling to the Fieldgroves, unsuitable investments consisting of the Striker Debentures;

c.   Engaging in the acts, practices and course of conduct described herein resulting in Striker's operation of a fraudulent Ponzi scheme; and

d.   Lawrence and Pope causing almost one hundred percent of Rusty and Mary Jane Fieldgrove's net worth and approximately eighty-six percent of the C. Fieldgrove Trust's net worth to be invested in speculative, high risk, illiquid direct participation program investments,

more than sixty percent of which consisted of Striker Debentures, for the purpose of earning higher commissions and other income.

**MP IV**

112. Lawrence, Pope, Professional Money Management, and CapWest employed a device, scheme and/or artifice to defraud the Fieldgroves in connection with their purchase of a Note in MP IV, as set forth hereinabove and additionally, including but not limited to, the following:

a. The failure to conduct a Due Diligence Investigation of the MP IV offering, and prior offerings conducted by Med Cap and its subsidiaries and affiliates, which would have revealed fraudulent practices as described herein, such as "round tripping" and the operation of a fraudulent Ponzi scheme as described herein; and

b. The offering of Notes in MP IV, pursuant to the terms of the offering, was only available to accredited investors. With this knowledge, and with the knowledge that Rusty and Mary Jane Fieldgrove were not accredited investors, Defendants sold a $150,000.00 Note in MP IV to Rusty and Mary Jane Fieldgrove. Further, in such sale, Defendants falsely completed Subscription documents and other documents so as to make it appear that Rusty and Mary Jane Fieldgrove were accredited investors and, thus, that the MP IV Notes were suitable investments.

113. In selling the Note in MP IV to the Fieldgroves, Lawrence, Pope, Personal Money Management, and CapWest made untrue statements of material fact, both verbally, and through the private placement memorandum of MP IV, as set forth hereinabove and additionally, including but not limited to:

a.  That administrative fees would only be taken in accordance with the provisions of the private placement memorandum when, in fact, administrative fees were taken contrary to such provisions;

b.  That the proceeds from the offering would be used to purchase medical receivables and other health care related assets when, in fact, substantial amounts of the proceeds were used for other purposes, including the payment of promised returns to investors in prior offerings; and

c.  That medical receivables and other health care assets would be purchased in arms length transactions at fair and reasonable prices when, in fact, practices such as "round tripping" of medical receivables at ever increasing prices, while the receivables were decreasing in value, was a common practice.

114.  In connection with the purchase and sale of the Note of MP IV to the Fieldgroves, Lawrence, Pope, Personal Money Management, and CapWest omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth above, and additionally, including but not limited to:

a.  That MP IV was part of a fraudulent Ponzi scheme operated by Med Cap and its subsidiaries and affiliates in which the proceeds from later investors were used to pay promised returns to investors in earlier offerings;

b.  The amount of offering proceeds which would be used to pay administrative fees; and

c.  The risks of the lack of audited financial statements of Med Cap and the prior offerings which risks included:

i. That investor money from MP IV would be comingled with investor money in other offerings;

ii. That investor money in MP IV would be used to pay promised returns to investors in prior offerings of Med Cap, its subsidiaries and affiliates;

iii. The practice of round tripping; and

iv. That non medical receivables and health care assets would be acquired with the proceeds of the MP IV offering money.

115. Each of Lawrence, Pope, Personal Money Management, and CapWest engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Fieldgroves in connection with its purchase of a Note in MP IV as described herein, and additionally, including but not limited to:

a. Falsely completing subscription documents and agreements, and other documents as described herein, to make it appear that Rusty and Mary Jane Fieldgrove were accredited investors when, in fact, Rusty and Mary Jane Fieldgrove were not accredited investors and therefore not an eligible purchaser; and

b. The failure to conduct a Due Diligence Investigation which would have revealed, among other things, fraudulent practices, including:

i. Round tripping of receivables;

ii. Operation of a fraudulent Ponzi scheme; and

iii. The purchase of non medical receivables and non health care assets.

116.     The Fieldgroves relied upon the representations of the Defendants including the representations contained in the written documents and materials provided to the Fieldgroves in the purchase of the DPP Investments. Such reliance was justified.

117.     As a direct and proximate result of Defendants' acts and conduct in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, the Fieldgroves purchased the DPP Investment securities described herein and have suffered a loss upon such investments.

## SECOND CLAIM FOR RELIEF

### (15 U.S.C. § 78t(a))

118.     Paragraphs 1 through 117 of this Complaint are re-alleged and incorporated by reference herein.

119.     Capwest is directly or indirectly controlled by Capstone, Colorado Capital, Hall, and White.

120.     Capstone, Colorado Capital Holding, Hall, and White are, pursuant to 15 U.S.C. § 78t(a), jointly and severally liable with and to the same extent as CapWest for its violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

121.     TIC Capital, Womack, Pacific Security, and Pacific Security Partners, directly or indirectly control Direct Capital.

122.     TIC Capital, Womack, Pacific Security, and Pacific Security Partners are pursuant to 15 U.S.C. § 78t(a) jointly and severally liable with, and to the same extent as Direct Capital, for its violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

### (Texas Securities Act)

123.    Paragraphs 1 through 103 of this Complaint are re-alleged and incorporated by reference herein.

124.    Each of the investments described in paragraphs 46 and 47 above are securities within the meaning of Vernon's Ann., Tex. Civ. St., Art. 581-4A. Each of the Plaintiffs and each of Defendants Direct Capital, Womack, TIC Capital, Pacific Security Partners, and Pacific Securities are a person within the meaning of Vernon's Ann., Tex. Civ. St., Art. 581-4B.

125.    In violation of Vernon's Ann., Tex. Civ. St., Art. 581-33A(2), Direct Capital offered and sold the securities consisting of Striker Series B Debentures in the amount of $300,000 to Rusty and Mary Jane Fieldgrove on or about December 21, 2006, Striker Series B Debentures in the amount of $400,000 to the C. Fieldgrove Trust on or about December 21, 2006, and Striker Series B-2 Debentures in the amount of $90,000 to the C. Fieldgrove Trust on or about June 22, 2007 by means of untrue statements of material fact and omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged in this Complaint.

126.    Womack, TIC Capital, Pacific Security Partners, and Pacific Security are persons who directly or indirectly control Direct Capital, the seller of the Series B and Series B-2 Debentures to the Fieldgroves, and pursuant to Vernon's Ann., Tex. Civ. St., Art. 581-33F(1) are jointly and severally liable with Direct Capital and liable to the extent as if they were the seller.

127.    Womack, TIC Capital, Pacific Security Partners, and Pacific Security are each a person who directly or indirectly, with the intent to deceive or defraud, or with reckless disregard

for the truth or the law, materially aided Direct Capital, a seller of the Series B and Series B-2 Debentures to the Fieldgroves, and are jointly and severally liable with and to the same extent as Direct Capital, pursuant to Vernon's Ann, Tex. Civ. St., Art. 581-33F.(2).

128.    Direct Capital, Womack, TIC Capital, pacific Security Partners, and Pacific Security are each a person who directly or indirectly, with intent to deceive or defraud, or with reckless disregard for the truth or the law, materially aided Striker, a seller of the Series B Debentures and Series B-2 Debentures, and are jointly and severally liable with and to the same extent as Striker, pursuant to Vernon's Ann., Tex. Civ. St., Art. 581-33F(2).

129.    Through on or about December of 2008, the Fieldgroves received monthly payments upon the Series B Debentures and Series B-2 Debentures as represented in the private placement memorandum and pursuant to verbal representations as alleged in this Complaint. In January of 2009, monthly payments upon the Series B Debentures and Series B-2 Debentures ceased. Subsequently, on December 3, 2009, the Striker Litigation was filed. The Fieldgroves did not actually discover the untruths and omissions alleged herein until on or about December 3, 2009, upon the filing of the Striker Litigation. The Fieldgroves could not have reasonably discovered the untruths or omissions prior to January of 2009, when payments upon the Series B Debentures and Series B-2 Debentures in Striker ceased, as until such time there were no indications of the untruths or omissions of Striker's fraudulent Ponzi scheme.

130.    The Fieldgroves have brought this claim for relief within the applicable statute of limitations contained in Vernon's Ann., Tex. Civ. St., Art. 581-33H(2) in that not more than three years has transpired since discovery of the untruth or omission or after discovery should have made in the exercise of reasonable diligence or more than five years after the sale.

131.    The Fieldgroves still own the Series B Debentures and Series B-2 Debentures and thus seek rescission and are entitled to the amount paid for the Series B Debentures and Series B-2 Debentures plus interest thereon at the legal rate from the purchase date, the amount of income received, plus costs and reasonable attorney's fees pursuant to Vernon's Ann., Tex. Civ. St., Art. 581-33D(1), (6) and (7).

## FOURTH CLAIM FOR RELIEF

### (Colorado Securities Act)

132.    Paragraphs 1 through 103 of this Complaint are re-alleged and incorporated by reference herein.

133.    Each of the investments described in paragraphs 46 and 47 above are securities within the meaning of C.R.S.A. § 11-51-201(17). Each of the Plaintiffs and each of Defendants CapWest, Capstone, Colorado Holdings, Hall, and White are persons within the meaning of C.R.S.A. §11-51-201(12).

134.    In violation of C.R.S.A. §11-51-604(4), CapWest and Pope offered and sold securities consisting of Striker Series B Debentures in the amount of $300,000.00 to Rusty and Mary Jane Fieldgrove on or about December 21, 2006, Striker Series B Debentures in the amount of $400,000.00 to the C. Fieldgrove Trust on or about December 21, 2006, and Striker Series B-2 Debentures in the amount of $90,000.00 to the C. Fieldgrove Trust on or about June 22, 2007 by means of untrue statements and material fact and omissions to state a material fact necessary in order to make the statements made, in light the circumstances under which they were made, not misleading, as alleged in this Complaint.

135. In violation of C.R.S.A. § 11-61-604(3), CapWest and Pope recklessly, knowingly, or with an intent to defraud, sold to Rusty and Mary Jane Fieldgrove and the C. Fieldgrove Trust the investments described in paragraphs 46 and 47 of this Complaint on the dates set forth in paragraphs 46 and 47 of this Complaint in violation of C.R.S.A. § 11-51-501(1) by:

a. Employing one or more devices, schemes, or artifices to defraud the Fieldgroves as alleged in this Complaint;

b. By means of untrue statements of material fact and omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged in this Complaint;

c. Engaged in acts and practices in the course of business which operated as a fraud and deceit upon the Fieldgroves, as alleged in this Complaint.

136. Each of Capstone, Colorado Capital, Hall, and White directly or indirectly controlled CapWest and Pope, each a person liable under C.R.S.A. § 11-51-604(3) and/or (4) and pursuant to C.R.S.A. §11-51-604(5)(b) are jointly and severally liable with and to the same extent as CapWest and Pope for their violations of C.R.S.A. §11-51-604(3) and/or (4)

137. CapWest directly or indirectly controlled Pope, a person liable under C.R.S.A. § 11-51-604(3) and/or (4), and pursuant to C.R.S.A. § 11-51-604(5)(b) is jointly and severally liable with and to the same extent as Pope for his violation of C.R.S.A. .§ 11-51-604(3 and/or (4).

138. Through on or about December of 2008, the Fieldgroves received monthly payments upon the Series B Debentures and Series B-2 Debentures as represented in the Private

Placement Memorandum and pursuant to verbal representations as alleged in this Complaint.  In

January of 2009, monthly payments upon the Series B Debentures and Series B-2 Debentures

ceased. Subsequently, on December 3, 2009 the Striker litigation was filed. The Fieldgroves did

not actually discovery the untruths or omissions alleged herein until on or about December 3,

2009, upon the filing of the Striker litigation.  The Fieldgroves could not have reasonably

discovered the untruths or omissions prior to January of 2009, when payments upon the Series B

Debentures and Series B-2 Debentures in Striker ceased, as until such time there was no

indications of the untruths or omissions of Striker's fraudulent Ponzi scheme.

139.    The Fieldgroves have brought this Claim For Relief within the applicable Statute

of Limitations contained in C.R.S.A. §11-51-604(8), and that not more than three years has

transpired since discovery of the untruths or omissions or after discovery should have been made

in the exercise of reasonable diligence, or more than five years after the sale.

140.    Pursuant to C.R.S.A. §11-51-604(3)and (4), the Fieldgroves are entitled to an

award of the amount paid for the Series B Debentures and Series B-2 Debentures, plus interest

thereon at the legal rate from the purchase date, plus the amount of income received, plus

reasonable costs and attorney's fees.

## FIFTH CLAIM FOR RELIEF

### (Professional Negligence – Dennis R. Lawrence)

141.    Paragraphs 1 through 140 of this Complaint are re-alleged and incorporated by

reference herein.

142.    Lawrence is a certified public accountant licensed in the State of Wyoming.

Lawrence holds himself out not only as a professional accountant but as a person knowledgeable

and sophisticated in financial and investment matters. Whether as part of his accounting practice, or as a separate business enterprise, Lawrence provides financial and investment advice to his accounting clients.

143. Due to his position as an accountant, Lawrence is privileged to personal and private financial information of his clients, including Rusty and Mary Jane Fieldgrove, both of which were his clients, and for whom he has performed professional accounting work. In addition to performing professional accounting work, as alleged herein, Lawrence has provided financial and investment advice to Rusty and Mary Jane Fieldgrove.

144. Based upon the accountant-client relationship between Lawrence and Rusty and Mary Jane Fieldgrove, and the investment advisor-client relationship between Lawrence and Rusty and Mary Jane Fieldgrove, Lawrence owed to Rusty and Mary Jane Fieldgrove that degree of care, skill, diligence, and knowledge commonly possessed and exercised by reasonable, careful, and prudent accountants in Wyoming and a fiduciary duty. These duties include, but are not limited to:

a. The duty to accurately and truthfully provide financial information concerning Rusty and Mary Jane Fieldgrove when requested to do so; and

b. The duty to provide suitable financial and investment advice in view of the risk tolerance, time horizon, investment knowledge, investment experience, income needs, and liquidity needs of Rusty and Mary Jane Fieldgrove, all of which Lawrence was privy to based upon not only the accountant-client relationship but upon the financial and investment advisor-client relationship which existed between Lawrence and Rusty and Mary Jane Fieldgrove.

145.    Lawrence breached his professional duties which he owed to Rusty and Mary Jane Fieldgrove, and breached the fiduciary duty which he owed to Rusty and Mary Jane Fieldgrove in numerous ways, including but not limited to, the following:

a.    Completing subscription documents and CapWest forms so as to falsely portray Rusty and Mary Jane Fieldgrove as accredited investors;

b.    Recommending and selling, and/or participating in, the sale of the DPP Investments described herein to Rusty and Mary Jane Fieldgrove, such investments taking virtually all of the assets of Rusty and Mary Jane Fieldgrove, and converting them into high risk, illiquid investments;

c.    With knowledge that each of the investments described herein which he offered, sold and/or participated in the sale of to Rusty and Mary Jane Fieldgrove were only available for accredited investors, and with knowledge that Rusty and Mary Jane Fieldgrove were not accredited investors, advised Rusty and Mary Jane Fieldgrove to purchase the DPP Investments which by the very terms of the offering, Rusty and Mary Jane Fieldgrove were not suitable;

d.    With full knowledge of all of the assets of Rusty and Mary Jane Fieldgrove, offered, sold and/or participated in the sale of high risk, unsuitable, illiquid investments, all of which were in fraudulent Ponzi schemes, to Rusty and Mary Jane Fieldgrove;

e.    Failure to do a Due Diligence Investigation of the DPP Investments. In particular, as an accountant, Lawrence should have immediately recognized the significance of the lack of any audited financial statements in connection with the Striker offerings, and the Med Cap Notes. Lawrence was aware that the foregoing offerings purchased by Rusty and Mary Jane Fieldgrove were but one of a series and should have recognized the significant risks of such DPP

Investments lacking audited financial statements; and

f. Instead of advising and recommending diversification of Rusty and Mary Jane Fieldgrove's investments, advised and recommended Rusty and Mary Jane Fieldgrove to concentrate their investments into private, high risk, illiquid direct participation programs, with approximately sixty-six percent of such DPP Investments concentrated in oil and gas.

146. As described herein, Lawrence breached the standard of care applicable to his profession and breached the fiduciary duty owed to Rusty and Mary Jane Fieldgrove. As a direct and proximate result of the professional negligence of Lawrence, Rusty and Mary Jane Fieldgrove have sustained a loss upon the DPP Investments as set forth herein together with the incurrence of significant costs and attorney's fees incurred herein in recovering such investment losses.

## SIXTH CLAIM FOR RELIEF

### (Professional Negligence of Randall Pope)

147. Paragraphs 1 through 146 of this Complaint are re-alleged and incorporated by reference herein.

148. At all times relevant hereto, Pope was a registered representative with FINRA and/or its predecessor, the National Association of Securities Dealers, Inc. ("NASD), and held himself out to the public in general and, in particular, to the Fieldgroves, as a professional knowledgeable and sophisticated in investments and financial and investment advice.

149. As a professional in the field of rendering financial and investment advice, Pope owed to the Fieldgroves a fiduciary duty including a duty and standard of care of:

a. A knowledgeable and sophisticated individual in the field of financial and investment advice; and

b. Pursuant to rules and regulations of FINRA and its predecessor, the NASD, a duty to "know your customer" meaning to know and understand the customer's risk tolerance, time horizon, investment knowledge, investment experience, income needs, liquidity needs, and any other matter important and/or significant to the recommendation or giving of financial and investment advice.

150. Pope breached this fiduciary duty and duty of professional care and the duty to "know your customer" in the following respects:

a. Pope failed to advise diversification, instead, concentrating the assets of the Fieldgroves in high risk, illiquid, private direct participation program investments, more than sixty percent of which were concentrated in oil and gas, and all of which proved to be fraudulent Ponzi schemes;

b. Knowingly offering and selling to Rusty and Mary Jane Fieldgrove investments only suitable to accredited investors, with knowledge that Rusty and Mary Jane Fieldgrove were not accredited investors;

c. Knowingly offering and selling to the Fieldgroves investments that were unsuitable in view of the Fieldgroves' risk tolerance, investment objectives, time horizons, investment experience, investment knowledge, and in the case of the C. Fieldgrove Trust, the age of the beneficiary; and

d. The failure to do a Due Diligence Investigation, the most significant failure in such area to be the failure to recognize the significance of the lack of audited financial statements

in all of the investments sold by Pope to the Fieldgroves, the result being the sale of fraudulent Ponzi scheme investments to the Fieldgroves.

151.    As a direct and proximate result of the professional negligence of Pope, the Fieldgroves have sustained a loss upon the DPP Investments described herein together with costs and attorney's fees incurred herein in recovering such investment losses.

## SEVENTH CLAIM FOR RELIEF

### (Fraud)

152.    Paragraphs 1 through 151 of the Complaint are re-alleged and incorporated by reference herein.

153.    As set forth herein, the Defendants directly and/or indirectly participated in a fraud, and/or aided and abetted in a fraud, consisting of the making of untrue statements of material fact, and the failure to disclose material facts to the Fieldgroves, and otherwise engaged in acts, practices, and courses of dealings which operated as a fraud upon the Fieldgroves, in the offer and sale of the DPP Investments described herein to the Fieldgroves.  In purchasing the DPP Investments described herein, the Fieldgroves relied upon the verbal representations made to them by the Defendants, the written representations made in the private placement memoranda and other offering materials provided to them, the completeness of the verbal and written statements made to them, and the legitimate appearance that the private placement memoranda and offering documents presented.  Such reliance was justified.

154.    As a direct and proximate result of the fraud of the Defendants, including their aiding and abetting through the control of those directly participating in the fraud and through the material assistance provided to those participating in the fraud, the Fieldgroves have suffered

57

loss upon the DPP Investments, together with costs and attorney's fees incurred herein in recovering such amount.

## EIGHTH CLAIM FOR RELIEF

### (Civil Conspiracy)

155.    Paragraphs 1 through 154 of this Complaint are re-alleged and incorporated by reference herein.

156.    Lawrence, Pope, and CapWest entered into an agreement and/or understanding, the purpose of which was to offer and sell to the Fieldgroves, and numerous other residents of the State of Wyoming, high risk unregistered securities consisting of DPP Investments and other securities, both registered and unregistered.

157.    In order to accomplish the above-said purpose and objective of offering and selling high risk unregistered securities to the Fieldgroves and others within the State of Wyoming, Lawrence, Pope, and CapWest engaged in numerous meetings and discussions, the exact dates of which are presently unknown but upon information and belief are alleged to have occurred between on or about approximately July of 2006 through on or about September of 2008.

158.    Lawrence, Pope, and CapWest agreed to accomplish the above-said purpose and objective through agreements, including but not limited to:

a. Lawrence and Pope jointly recommending to the Fieldgroves and others the purchase of the DPP Investments made by the Fieldgroves and others;

b. Distributing private placement memoranda and other offering documents of the DPP Investments to the Fieldgroves and others; and

58

c. Offering and selling to the Fieldgroves and others the DPP Investments described herein.

159. In offering and selling to the Fieldgroves the DPP Investments as described herein, Lawrence, Pope, and CapWest committed unlawful overt acts as alleged herein, including but not limited to violation of federal securities laws as alleged herein.

160. Direct Capital and CapWest entered into an agreement and/or understanding, the purpose of which was to offer and sell to the Fieldgroves and numerous other residents of the State of Wyoming and other states, the Striker Debentures.

161. In order to accomplish the above-said purpose and objectives of offering and selling Striker Debentures to the Fieldgroves and others, Direct Capital, through its representatives, who are currently unknown to the Plaintiffs, and CapWest, through its representatives, who are also currently unknown to the Plaintiffs, engaged in numerous meetings and discussions, the exact dates of which are presently unknown but upon information and belief are alleged to have occurred on or about approximately July of 2006 through at least September of 2007.

162. Direct Capital and CapWest agreed to accomplish the above-said purpose and objectives through agreements, including but not limited to:

a. CapWest serving as a member of the "selling group" and, as a member of the selling group, recommending and selling to the Fieldgroves and others, the Striker Debentures;

b. CapWest, as a member of the selling group, distributing private placement memoranda and other offering documents to the Fieldgroves and others; and

c. The offering and selling to the Fieldgroves and others of the Striker Debentures as described herein.

163. In offering and selling to the Fieldgroves the Striker Debentures as described herein, Direct Capital and CapWest committed unlawful overt acts as alleged herein, including but not limited to violation of federal securities laws as alleged herein.

164. As a direct and proximate result of the unlawful civil conspiracies engaged in by Lawrence, Pope, and CapWest, and by Direct Capital and CapWest, the Fieldgroves have suffered a loss upon the DPP Investments, together with costs and attorney's fees incurred herein in recovering such amount.

## NINTH CLAIM FOR RELIEF

### (Negligence)

165. Paragraphs 1 through 164 of this Complaint are re-alleged and incorporated by reference herein.

166. Through the acts and omissions described herein, the Defendants Lawrence, Pope, Direct Capital, Womack CapWest and Holmes offered and/or sold, directly or indirectly, aided and abetted in the sale, and/or directly or indirectly controlled, thus aiding and abetting others, in the sale of the DPP Investments described herein to the Fieldgroves.

167. Each of the Defendants Lawrence, Pope, Direct Capital, Womack CapWest and Holmes owed a duty to the Fieldgroves as described herein.

168. Each of the Defendants Lawrence, Pope, Direct Capital, Womack CapWest and Holmes breached the duty each owed to the Fieldgroves through the acts and omissions described herein.As a direct and proximate result of the Defendants' breaches of the duties each

owed to the Fieldgroves, the Fieldgroves have suffered a loss upon the DPP Investments described herein, together with costs and attorney's fees incurred herein in recovering such losses.

## TENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – Holmes)

169.    Paragraphs 1 through 168 of this Complaint are re-alleged and incorporated by reference herein.

170.    Holmes served as the trustee, and pursuant to representations contained in the private placement memorandum for the Striker Series B and Series B-2 Debentures, was purportedly an "independent third party trustee" for the purchasers of the Series B and Series B-2 Debentures. As a trustee for the Debenture holders of the Series B and Series B-2 Striker Debentures, including the Fieldgroves, Holmes occupied a position of trust and confidence and as a trustee was a fiduciary as to the Fieldgroves.

171.    As the trustee for the benefit of the Fieldgroves, Holmes owed the Fieldgroves a fiduciary duty of honesty, good faith, fair dealing, and fulfillment of his duties as trustee in an honest and good faith manor for the benefit of the Fieldgroves.

172.    Holmes breached the fiduciary duty which he owed the Fieldgroves in ways including the following:

a. In accordance with the representations contained in the private placement memorandum for the Series B and Series B-2 Striker Debentures, failing to be "independent." Holmes was never "independent" as at all times relevant to the allegations of this Complaint he was an officer of Striker, the general counsel of Striker, and/or outside legal counsel to Striker, in

61

all such capacities, either directly employed by or serving at the pleasure of Striker, the issuer of the Debentures;

b. Being a "third party" as to Striker. Holmes was never a "third party" as to Striker at all times relevant to the allegations of this Complaint as he was either an officer of Striker, the general counsel of Striker, and/or outside legal counsel either directly employed by or serving at the pleasure of Striker;

c. Failing to disclose to the Fieldgroves that as trustee for the Fieldgroves and other Debenture holders in the Series B and Series B-2 Striker Debentures, that he was neither "independent" nor a "third party;"

d. Failing to disclose to the Fieldgroves and other holders of the Series B and Series B-2 Striker Debentures, that Striker was operating a fraudulent Ponzi scheme as has been described in this Complaint;

e. Failing to fulfill his duties as trustee for the benefit of the Fieldgroves and other Series B and Series B-2 Striker Debenture holders by, among other things, failing to foreclose and/or take possession of the collateral for the benefit of the Fieldgroves and other Series B and Series B-2 Striker Debenture holders; and

f. Failing to disclose to the Fieldgroves and other holders of Series B and Series B-2 Striker Debentures that the collateral was not as represented in the private placement memorandum, and was not sufficient to secure the Debentures.

173. As a direct and proximate result of the breach of fiduciary duty of Holmes, the Fieldgroves have suffered a loss upon the Series B and Series B-2 Striker Debentures which they purchased, together with costs and attorney's fees incurred herein in recovering such amounts.

### ELEVENTH CLAIM FOR RELIEF

### (Vicarious Liability and *Respondeat Superior*)

174. Paragraphs 1 through 173 of this Complaint are re-alleged and incorporated by reference herein.

175. Pope was an employee and/or otherwise controlled pursuant to agreement or other arrangement by CapWest.

176. Pope was a registered representative, registered pursuant to FINRA and/or its predecessor, the NASD, of CapWest.

177. Under principles of vicarious liability and/or *respondeat superior*, CapWest is liable for the acts and conduct of Pope as set forth herein.

### PRAYER FOR RELIEF

WHEREFORE, Russell C. Fieldgrove, Mary Jane Fieldgrove, and the Cecil H. Fieldgrove Trust, Cecil H. Fieldgrove Trustee, respectfully request the following:

A. An award of damages against Dennis R. Lawrence, Randall Pope, Professional Money Management, LLC, CapWest Securities, Inc., Capstone Financial Group, Inc., Colorado Capital Holdings, LLC, Dale Keith Hall, and Debra Harrawood White in the amount of $1,140,000.00, or other such amount as may be established at trial.

B. An award of damages against Direct Capital Securities, Inc., TIC Capital Markets, Inc., Clay Harriss Womack, Pacific Security Partners, LP, Pacific Security Group, Inc., Steve Holmes, and Richard Hancock in the amount of $790,000.00 or such other amount as may be established at trial.

C. Costs incurred herein.

D.    Attorney's fees as provided by law.

E.    Any other relief deemed just and proper under the circumstances.

DATED this 4th day of August, 2010.

DAVIS & CANNON, LLP

By: _____

J. Mark Stewart
422 West 26th Street
P.O. Box 43
Cheyenne, WY 82003
Phone: (307) 634-3210
Facsimile: (307) 778-7118
mark@davisandcannonchey.com

Kim D. Cannon
DAVIS & CANNON, LLP
40 South Main
Sheridan, WY 82801
Phone: (307) 672-7491
Facsimile: (307) 672-8955
cannon@davisandcannon.com

John A. Hutchings (*pro hac vice* pending)
DILL DILL CARR STONEBRAKER
  & HUTCHINGS, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone: (303) 777-3737
Facsimile: (303) 777-3823
jhutchings@dillanddill.com

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand a trial by Jury.

DATED this _4th_ day of August, 2010.

DAVIS & CANNON, LLP

By: _____

J. Mark Stewart
422 West 26th Street
P.O. Box 43
Cheyenne, WY 82003
Phone: (307) 634-3210
Facsimile: (307) 778-7118
mark@davisandcannonchey.com


Kim D. Cannon
DAVIS & CANNON, LLP
40 South Main
Sheridan, WY 82801
Phone: (307) 672-7491
Facsimile: (307) 672-8955
cannon@davisandcannon.com


John A. Hutchings (*pro hac vice* pending)
DILL DILL CARR STONEBRAKER
   & HUTCHINGS, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone: (303) 777-3737
Facsimile: (303) 777-3823
jhutchings@dillanddill.com

## CERTIFICATE OF SERVICE

I, J. Mark Stewart, certify that on the 5th day of August, 2010, a copy of the foregoing was served by the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following:

Jeffrey C. Brinkerhoff
Mark W. Gifford
Gifford & Brinkerhoff
jeff@giffordbrinkerhoff.com
mark@giffordbrinkerhoff.com

David A. Baugh
Baugh Dalton Carlson & Ryan, LLC
dbaugh@baughdaltonlaw.com

And served via United States mail to the following:

Rick L. Koehmstedt
Schwartz, Bon, Walker & Studer, LLC
141 South Center, Suite 500
Casper, WY 82601

Thomas N. Fitzgibbon
Kimberly Thigpen
Pfeiffer, Thigpen, Fitzgibbon & Ziontz, LLP
233 Wilshire Blvd., Suite 220
Santa Monica, CA 90401

Jason Tangeman
Nicholas & Tangeman, LLC
170 North Fifth Street
P.O. Box 929
Laramie, WY 82072

Charles Gameros, Jr.
Hoge & Gameros, LLP
4514 Cole Avenue, Suite 1500
Dallas, TX 75205

K. Lawson Pedigo
Miller, Keffer, Bullock & Pedigo
8401 North Central Expressway, Suite 630
Dallas, TX 75225

Thomas N. Long
Laura Jean Jackson
Long, Reimer, Winegar, Beppler, LLP
2120 Carey Avenue, Suite 300
Cheyenne, WY  82001

David F. DeFazio
DeFazio Law Office, LLC
172 Center Street, Suite 203
P.O. Box 4877
Jackson, WY  83001

Amir Tadjedin
Markun Zusman & Compton LLP
811 SW Naito Parkway, Suite 420
Portland, OR  97204

_____
J. Mark Stewart