Kim D. Cannon (Wyoming State Bar #5-1401)
J. Mark Stewart (Wyoming State Bar #6-4121)
Davis & Cannon, LLP
40 South Main
P.O. Box 728
Sheridan, WY 82801
Telephone:     (307) 672-7491
Facsimile:     (307) 672-8955
cannon@davisandcannon.com
mark@davisandcannonchey.com

John A Hutchings (*pro hac vice*)
Dill Dill Carr Stonbraker & Hutchings, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone:         (303)777-3737
Facsimile:     (303) 777-3823
jhutchings@dillanddill.com
**Attorneys for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| RUSSELL C. FIELDGROVE, et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Nos.    10-CV-0104-D |
| v. | ) | 10-CV-0120-D |
| | ) | |
| DENNIS R. LAWRENCE, et al | ) | |
| | ) | |
| Defendants. | ) | |
| **AND** | ) | |
| | ) | |
| THE MARTHA W. GIBBS REVOCABLE | ) | |
| TRUST, SUSAN GIBBS, SCOTT M. GIBBS, | ) | |
| AND JAMES W. GIBBS, TRUSTEES, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| DENNIS R. LAWRENCE, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

1

---

**PLAINTIFFS' RESPONSE TO DIRECT CAPITAL DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(b)(6)**

---

According to the Direct Capital Defendants,[1] they can offer and sell securities in a fraudulent Ponzi scheme and by being deaf, dumb and blind avoid legal liability for their acts and omissions.  Although Defendant Direct Capital Securities, Inc. ("Direct Capital") served as the Dealer-Manager for the offerings of debentures purchased by Plaintiffs Russell and Mary Jane Fieldgrove ("Rusty and Mary Jane Fieldgrove"), the Cecil H. Fieldgrove Trust, Cecil H. Fieldgrove, Trustee (the "Fieldgrove Trust"), and the Alida D. Talmage Trust, FBO Martha W. Gibbs, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees (the "Talmage Trust") (the foregoing collectively referred to herein as the "Plaintiffs"), the Direct Capital Defendants disclaim any responsibility for their role in selling securities in the Striker Petroleum, LLC fraudulent Ponzi scheme, and ask that this Court absolve them from any accountability for their acts and omissions.  In ruling on a Motion to Dismiss, the Court must accept all allegations of the Amended Complaint as true.  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 1008).  Accepting the allegations of the Amended Complaint as true, and taken collectively together with the documents which the parties have properly submitted to the Court, the Plaintiffs have sufficiently stated claims for relief against the Direct Capital Defendants, and have placed them on notice of what Plaintiffs intend to prove.

The Direct Capital Defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6) Motions") in each of the above cases is substantially similar.  In the interest of

---

[1] The "Direct Capital Defendants" refers to Defendants Direct Capital Securities, Inc., TIC Capital Markets, Inc., Pacific Security Income Partners, LP, Pacific Security Group, Inc., and Clay Harriss Womack.

litigation efficiency, the Plaintiffs are submitting this combined response to the Direct Capital Defendants' Rule 12(b)(6) Motions, and are filing this Response in each of the above-captioned cases.  Where the Direct Capital Defendants raise an issue as to only one of the Plaintiffs, this Response identifies that issue and responds on behalf of such Plaintiff.  Unless otherwise identified, this Response applies equally to both of the Rule 12(b)(6) Motions filed by the Direct Capital Defendants in the above-captioned cases.

In the case of *Russell C. Fieldgrove, et al v. Dennis R. Lawrence, et al*, Case No. 10-CV-0104-D (the "Fieldgrove case"), the Amended Complaint (Fieldgrove Doc. 30) is at issue.  In the *Martha W. Gibbs Revocable Trust, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees, at al v. Dennis R. Lawrence, et al*, Case No. 10-CV-0120-D (the "Gibbs case"), the Amended Complaint is also at issue (Gibbs Doc. 39).  (The Amended Complaint in each of the Fieldgrove case and Gibbs case are referred to herein as the "Complaints").  The Complaints allege the fraudulent Ponzi scheme perpetrated by Striker Petroleum, LLC ("Striker") through the offering of approximately $57,000,000 of debentures to approximately 540 investors nationwide (Fieldgrove Amended Complaint, ¶¶ 28-35; Gibbs Amended Complaint, ¶¶ 31-38; Complaint in the matter of *Securities and Exchange Commission v. Striker Petroleum, LLC, et al*, Case No. 3:09-CV-02304-D, United States District Court for the Northern District of Texas (the "Striker Litigation Complaint"), Miles Doc. 48-2).  The Complaints allege the following regarding the Direct Capital Defendants:

1.      Direct Capital is a Broker-Dealer licensed and registered pursuant to The Financial Industry Regulatory Authority (FINRA"), federal law, and Wyoming state law to offer and sell securities to the public.  Direct Capital served as the Managing Broker-Dealer or a

Broker-Dealer of the Striker debenture offerings (Fieldgrove Amended Complaint, ¶ 19; Gibbs Amended Complaint, ¶ 21).

2. TIC Capital Markets, Inc. ("TIC Capital") directly owns seventy-five percent or more of Direct Capital and directs the management and policies of Direct Capital (Fieldgrove Amended Complaint, ¶ 20; Gibbs Amended Complaint, ¶ 21),

3. Pacific Security Income Partners, LP ("Pacific Security Partners"), through TIC Capital, is an owner of Direct Capital and directs the policies and management of Direct Capital (Fieldgrove Amended Complaint, ¶ 21; Gibbs Amended Complaint, ¶ 23).

4. Clay Harriss Womack ("Womack") was at all relevant times an Officer and Director of Direct Capital and was at all relevant times Chairman and Chief Executive Office of Direct Capital, TIC Capital, and Pacific Security Group, Inc.  Individually, and through TIC Capital and Pacific Security Group, Inc., Womack directs the policies and management of Direct Capital.  At all times relevant to the allegations of the Complaints, Womack was a general securities principal with Direct Capital (Fieldgrove Amended Complaint, ¶ 22; Gibbs Amended Complaint, ¶ 24).

5. Pacific Security Group, Inc. ("Pacific Security") is an owner of Direct Capital and directs the management and policies of Direct Capital (Fieldgrove Amended Complaint, ¶ 23; Gibbs Amended Complaint, ¶ 25).

The allegations of the Complaints are supported by the following:

1. The Broker Check Report of Direct Capital dated August 3, 2010 (Gibbs Doc. 89-2) filed with FINRA by Direct Capital states that TIC Capital directly owns seventy-five percent or more of Direct Capital and directs the management and policies of  Direct Capital, that Pacific

Security Partners, through TIC Capital, is an owner of Direct Capital and directs the management and policies of Direct Capital, that Pacific Security is an owner of Direct Capital and directs the management and policies of Direct Capital, and that Womack is directly, and through TIC Capital, is an owner and directs the policies and management of Direct Capital.

2.      The Annual Audited Reports, Form X-17A-5, Part III, of Direct Capital Securities, Inc. for the years ended December 31, 2006, 2007, and 2008, as filed with the United States Securities and Exchange Commission by Direct Capital Securities, Inc. disclose that Direct Capital Securities, Inc. is a wholly owned subsidiary of TIC Capital, that TIC Capital and Direct Capital file a consolidated income tax return, and that there exists a management agreement between Direct Capital and TIC Capital pursuant to which TIC Capital provides to Direct Capital administrative services, marketing support, and due diligence support, and in exchange therefor receives substantial fees from Direct Capital (Gibbs Doc. 89-3, 89-4 and 89-5).

3.      Womack is the Chief Executive Officer and Chairman of Direct Capital, TIC Capital, and Pacific Security (TIC Capital Firm Brochure; Gibbs Doc. 89-6).

4.      Direct Capital served as the Managing Broker-Dealer for the offerings of Striker Series B and Series B-2 Debentures and received compensation consisting of a Managing Dealer fee, a non-accountable marketing allowance, and a due diligence allowance (Miles Doc. 94-4 and 70).

5.      Prior to serving as the Managing Dealer of the Striker Series B and Series B-2 Debentures, Direct Capital served as the Managing Broker-Dealer of the Striker Series A Debentures and similarly received compensation, including a Managing Dealer fee, a non-

accountable marketing allowance, and a due diligence allowance (Miles Doc. 94-2). Prior to the Striker debenture offerings, Direct Capital participated as either a Managing Broker-Dealer or a Broker-Dealer in offerings of securities by Striker, including the Striker Legacy Interests, Amber Property LLC (Miles Doc. 96-3), the Striker Petroleum, LLC, Rework Program 2005 (Miles Doc. 96-4), and the Striker Legacy Interests CJ Property LLC (Miles Doc. 96-5). In each instance, Direct Capital received commissions or other remunerations for solicitation of purchases in connection with the sale of securities in each of the foregoing offerings.

The Complaints allege Direct Capital's participation in Striker securities offerings prior to the Plaintiffs' purchase of Striker debentures (Fieldgrove Amended Complaint, ¶¶ 81-85; Gibbs Amended Complaint, ¶¶ 79-83). The Complaints allege Direct Capital's role as the Managing Dealer of the Striker Series B and Series B-2 Debenture offerings (Fieldgrove Amended Complaint, ¶ 80; Gibbs Amended Complaint, ¶ 78). The Complaints allege that Direct Capital had an obligation pursuant to the FINRA rules to conduct a reasonable due diligence investigation of those offerings of Striker preceding the Striker Series B and Series B-2 Debenture offerings and, alternatively, because such facts were within the particular knowledge of the Direct Capital Defendants at this time, that either Direct Capital did not perform such a reasonable due diligence investigation, which resulted in untrue statements of material fact and material omissions made to the Plaintiffs, or that Direct Capital did conduct such a reasonable due diligence investigation and knowingly made untrue statements of material fact and omitted to disclose material facts to the Plaintiffs (Fieldgrove Amended Complaint, ¶¶ 85-88; Gibbs Amended Complaint, ¶¶ 83-86). The Complaints allege Direct Capital and Womack owed a duty to the Plaintiffs to conduct a full, complete, thorough, prudent, and reasonable due diligence

investigation of the Striker Debenture offerings, and other prior Striker offerings, of Striker, its subsidiaries, related entities, and Officers and Directors (Fieldgrove Amended Complaint, ¶ 89; Gibbs Amended Complaint, ¶ 87).  The Complaints allege Direct Capital and Womack breached their duty to conduct a due diligence investigation, specifically alleging how Direct Capital and Womack breached their duty of failing to conduct a due diligence investigation (Fieldgrove Amended Complaint, ¶ 90; Gibbs Amended Complaint, ¶ 88).  The Complaints further allege Direct Capital and Womack breached the duty owed to the Fieldgroves to supervise those engaged in the offer and sale of the Striker Series B and Series B-2 debentures, including Defendant CapWest Securities, Inc., who were members of the "selling group" for which Direct Capital served as Managing Broker-Dealer, that Direct Capital and Womack breached such duty, specifically alleging how Direct Capital and Womack breached such duty (Fieldgrove Amended Complaint, ¶¶ 91, 92; Gibbs Amended Complaint, ¶¶ 89, 90).

The Complaints allege receipt of private placement memoranda for the Series B and Series B-2 Debentures by the Plaintiffs (Fieldgrove Amended Complaint, ¶¶ 60, 77; Gibbs Amended Complaint, ¶¶ 50(b), alleging receipt of a private placement memorandum for the Striker Series A Debentures, which is identical to the private placement memorandum of Striker Series B Debentures (compare Miles Doc. 90-2 and 90-3, ¶¶ 56 and 57)).  The Complaints allege the untrue statements of material fact contained in the Striker Series B and Series B-2 private placement memoranda (Fieldgrove Amended Complaint, ¶¶ 61, 70(a) and 78; Gibbs Amended Complaint, ¶ 57).  The Complaints allege omissions to state material facts in the private placement memoranda (Fieldgrove Amended Complaint, ¶ 62 and 78; Gibbs Amended Complaint, ¶ 58).  The Complaints allege reliance or what is known as "transaction causation"

(Fieldgrove Amended Complaint, ¶¶ 74, 77 and 116; Gibbs Amended Complaint, ¶¶ 61 and 115).  The Complaints allege loss causation (Fieldgrove Amended Complaint, ¶ 117; Gibbs Amended Complaint, ¶ 116).

It is upon the above-described detailed factual allegations that Plaintiffs bring the following claims for relief against the Direct Capital Defendants:

1.      First Claim for Relief for violation of 15 U.S.C. § 78j(b) ("Section 10(b)") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") against Direct Capital.

2.      Second Claim for Relief pursuant to 5 U.S.C. § 78t(a) ("Section 20(a)") against TIC Capital, Womack, Pacific Security, and Pacific Security Partners.

3.      Third Claim for Relief (Fieldgrove case) and Sixth Claim for Relief (Gibbs case) for violation of Vernon's Ann., Tex. Civ. St., Art. 581-33A(2) ("Section 33F(2)") of the Texas Securities Act by Direct Capital, for violation of Vernon's Ann., Tex. Civ. St., Art. 581-33F(1) ("Section 33F(1)") against Womack, TIC Capital, Pacific Security Partners, and Pacific Security, as persons who directly or indirectly controlled Direct Capital, and for violation of Vernon's Ann., Tex. Civ. St., Art. 581-33F(2) ("Section 33F(2)") against Womack, TIC Capital, Pacific Security Partners, and Pacific Security, as persons who directly or indirectly controlled Direct Capital, and materially aided Direct Capital as the seller of the Series B and Series B-2 Debentures to the Plaintiffs, and for violation of Section 33F(2) by Direct Capital, Womack, TIC Capital, Pacific Security Partners, and Pacific Security, as persons who directly or indirectly materially aided Striker in its sale of Series B and Series B-2 Debentures.

4.      Seventh Claim for Relief (Fieldgrove case) and Eleventh Claim for Relief (Gibbs case) for common law fraud.

5. Eighth Claim for Relief (Fieldgrove case) and Twelfth Claim for Relief (Gibbs case) for civil conspiracy.

6. Ninth Claim for Relief (Fieldgrove case) and Thirteenth Claim for Relief (Gibbs case) for negligence.

For reasons set forth below, the Rule 12(b)(6) Motions of the Direct Capital Defendants to dismiss all claims of the Plaintiffs against them should be denied.

## ARGUMENT

### The Federal Rule of Civil Procedure 12(b)(6) Plausibility Standard

In Plaintiffs' Response to Defendant Steve Holmes' Motion to Dismiss (Miles Doc. 48, ¶¶ 12-13) and in Plaintiffs' Response to Defendant Richard Hancock's Motion for Judgment on the Pleadings (Miles Doc. 88, ¶¶ 6-8), Plaintiffs in the Miles case set forth the applicable standard to be utilized by a Court in determining Motions to Dismiss under Rule 12(b)(6). Rather than restate in its entirety the standard, and in accordance with this Court's Order of July 28, 2010, the Plaintiffs incorporate by reference herein, as if fully set forth herein, the full discussions contained in the section entitled, "Plaintiffs' Complaint Passes the Plausibility Test" in such Responses. Further, the Plaintiffs believe that this Court is well versed in the applicable standard to be applied and does not need another statement of such standard.

### The Plaintiffs State a Claim Under Section 10(b) Against Direct Capital

The Plaintiffs' First Claim for Relief in each of the Complaints alleges violation by Direct Capital of Section 10(b) and Rule 10b-5. The Plaintiffs do not allege a direct violation of Section 10(b) and Rule 10b-5 by the other Direct Capital Defendants. Direct Capital argues the Plaintiffs have failed to adequately plead a Section 10(b) violation for various reasons which are

common to all of the Plaintiffs.  Direct Capital raises an additional issue with respect to the Section 10(b) claim of the Talmage Trust that it is not a "purchaser" and thereby lacks the standing to bring a Section 10(b) claim.

1.      **The Purpose of Federal Securities Laws is the Protection of Investors.**

The major objective of federal securities laws is the protection of the investing public. *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 85 S. Ct. 275, 284 (1963). Congress' remedial purpose in enacting federal securities laws is to protect investors by compelling full and fair disclosure relative to the issuance of any type of securities.  *Landreth Timber Company v. Landreth*, 471 U.S. 681, 687, 105 S. Ct. 2297, 2302 (1985).  The fundamental purpose of securities laws is protection of the investor from the sale of worthless securities through misrepresentation.  *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 580 (10th Cir. 1991).  The securities laws achieve this purpose by two means:  (1) requiring disclosure to investors of relevant accurate information upon which to base an investment decision; and (2) providing meaningful remedies for investors when the anti-fraud provisions of the laws have been violated.  *Id.*

Section 10(b) is one of the laws enacted to remedy securities law violations.  A Section 10(b) action can be brought by a purchaser or seller of any security against any person who has used any manipulative or deceptive device or contrivance in connection with the purchase or sale of a security.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S. Ct. 683, 687 (1983).  Although Section 10(b) carries a certain pleading and proof requirement, it should always be remembered that its purpose, as well as the purpose of all of the federal securities laws, is the protection of investors from manipulative or deceptive acts and practices.

2.      **The Talmage Trust has Standing under Section 10(b).**

Direct Capital correctly points out that a plaintiff must be a "purchaser" or a "seller" to have standing to bring a claim under Section 10(b) and Rule 10b-5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749, 95 S. Ct. 1917 (1975). Courts have, however, uniformly refused to construe the "purchaser" requirement as narrowly as Direct Capital would have this Court construe the requirement. *Blue Chip Stamps* involves a claim by a group that was offered the opportunity to purchase securities and declined to purchase. They then brought a claim under Section 10(b) and Rule 10b-5 alleging that the prospectus pursuant to which the offering had been made was unduly gloomy thereby fraudulently inducing them not to purchase what would have been a favorable purchase. The controlling factor of *Blue Chip Stamps* was not the lack of formal privity but the Court's concern with the policy implications of removing the barriers against litigation by persons who did not have proof of injury demonstrated by their status as a real purchaser or seller. *Gardner v. Surnamer*, 608 F. Supp. 1385, 1393 (E.D. Pa 1985). The Court in *Blue Chip Stamps* was concerned as the plaintiff had neither purchased nor sold securities that any judgment or recovery would be largely conjectural or speculative depending upon the plaintiff's subjective hypothesis. *Blue Chip Stamps*, 421 U.S. at 735, 95 S. Ct. at 1925.

The Talmage Trust's purchase was structured through Indian Plains, LLC by Defendants Dennis R. Lawrence ("Lawrence") and Randall Pope ("Pope") in an effort to satisfy the "accredited investor" requirement of the debenture offerings (Gibbs Amended Complaint, ¶ 44). Lawrence, as the Trustee of the Talmage Trust, and the accountant for Indian Plains, agreed to document the return of money upon the Striker Series B Debentures through Indian Plains to the Talmage Trust (Gibbs Amended Complaint, ¶ 44). The Talmage Trust has alleged that, in fact, it

was the purchaser of $492,000 of Striker Series B Debentures (Gibbs Amended Complaint, ¶¶ 44-45).   There is no conjecture or speculation about the purchase or the amount of purchase, which was the concern in *Blue Chip Stamps*.   Direct Capital does not contest the fact of the purchase or the manner in which the Talmage Trust made the purchase.

The United States Supreme Court has expressly stated that Section 10(b) and Rule 10b-5 must be broad and flexible so that the remedial purpose of the section and rule will be effectuated.   *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 St.Ct. 548, 553 (1967).   Courts have almost uniformly interpreted Section 10(b) and Rule 10b-5 to include as purchasers persons not in privity with the seller.   *Sharp v. I.S., Inc.*, 685 F. Supp. 688, 691-92 (S.D. Ill. 1988) (persons who advance money to a third party as their representative or agent to make the purchase may be a purchaser under Section 10(b) and Rule 10b-5).   *Mullen v. Sweet Water Development Corporation*, 619 F. Supp. 809, 814 (D. Colo. 1985) (plaintiffs were not record shareholders but possessed an equitable interest which was sufficient to give them standing as a purchaser under Section 10(b) and Rule 10b-5.   The Court noted the amount of stock was not conjectural, the claims arose out of a written contract, the number of shares were not in dispute and, thus, did not depend on the plaintiff's subjective hypothesis).   *Goodman v. Hentz & Company*, 265 F. Supp. 440 (N.D. Ill. 1967) (where the plaintiffs were actual parties to transactions that, except for the fraud of one of the defendants, would have resulted in actual purchases and sales of securities by the plaintiffs, they have standing to maintain an action under Section 10(b)).   *International Controls Corp. v. Vesco*, 593 F.2d 166, 188, n. 18 (2nd Cir. 1979), cert denied 442 U.S. 941, 99 S. Ct. 2884 (1979) (when a complaint sufficiently pleads fraud pertaining to a contract or option to purchase shares, the plaintiffs have standing to sue under the Securities Exchange Act of

1934).

3.      **Plaintiffs have Properly Plead Reliance.**

The "reliance" element of a Section 10(b) claim is synonymous with the "transaction causation" element of the Section 10(b) claim. *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 341, 125 S. Ct. 1627 (2005). Transaction causation is the link between the alleged Section 10(b) and Rule 10b-5 violation which caused the Plaintiffs to engage in the transaction in question. *Cellular Technology Services Co., Inc. v. TruePosition, Inc.*, 609 F. Supp. 223, 235 (D. Conn. 2009). Loss causation is the link between the alleged wrongful conduct and the economic harm suffered by the plaintiff. *Id*. A Section 10(b) claim is subject to the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). 15 U.S.C. § 78u-4(b)(1) and (2). 15 U.S.C. § 78u-4(b)(1) requires that as to each alleged untrue statement of material fact or omission to state a material fact, the complaint must specify each statement alleged to have been misleading and the reasons why such statement is misleading. 15 U.S.C. § 78u-4(b)(2) requires that a plaintiff state with particularity facts giving rise to a strong inference that a defendant acted with scienter. The elements subject to the heightened pleading requirements of the PSLRA are a defendant's conduct, or misrepresentations or omissions, and a defendant's state of mind. The PSLRA does not require causation and damages to be alleged with any heightened pleading requirement. A plaintiff need not plead causation, either transaction causation or loss causation, with specificity. *ABN AMRO v. Capital Intern. Ltd.*, 595 F. Supp. 2d 805, 845-46 (N.D. Ill. 2008). Fed.R.Civ.P. 8(a)(2) sets forth the requirements for pleading, both transaction causation and loss causation, which merely requires a plaintiff to provide "a short and plain statement of the claims showing the pleader is entitled to relief" such

that the defendant has "fair notice on what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957).  Also see, *In re CMS Energy Securities Litigation*, 403 F. Supp. 2d 625, 629-30 (E.D. Mich. 2005) (holding that causation must only be generally plead within the meaning of Fed.R.Civ.P. 8(a)(2)) and *Cellular Technology Services Co., Inc. v. TruePosition, Inc.* 609 F. Supp. 2d at 235 (causation is governed by Rule 8(a), not the heightened pleading requirements of Rule 9(b), thus the plaintiff's only requirement is to state a plausible claim of causation).

Transaction causation is properly plead when the allegations plausibly allege, under the Rule 8(a)(2) standard, that but for a defendant's wrongful acts, plaintiffs would not have entered into the transaction that resulted in their losses.  *In re Parmalat Securities Litigation*, 375 F. Supp. 2d 278, 302-03 (S.D.N.Y. 2005); *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 240 (S.D.N.Y. 1999).  Rusty and Mary Jane Fieldgrove have alleged receipt of a private placement memorandum of Striker Series B Debentures (Fieldgrove Amended Complaint, ¶ 60), the untrue statements of material fact contained within such private placement memorandum (Fieldgrove Amended Complaint, ¶ 61), the omission to state material facts in the Striker Series B Debenture private placement memorandum (Fieldgrove Amended Complaint, ¶ 62), their purchase of $300,000 of Striker Series B Debentures subsequent to receipt of the private placement memorandum (Fieldgrove Amended Complaint, ¶¶ 46 and 65), Striker's fraudulent Ponzi scheme (Fieldgrove Amended Complaint, ¶¶ 28-35), Direct Capital's role in the fraudulent Ponzi scheme (Fieldgrove Amended Complaint, ¶¶ 80-93), and their reliance upon written documents and materials, including the Striker Series B Debenture private placement memorandum provided to them (Fieldgrove Amended Complaint, ¶ 116).  Such allegations satisfy the Rule

8(a)(2) requirement to provide a short and plain statement of transaction causation providing Direct Capital with fair notice of what the Plaintiffs' claim is and the grounds upon which it rests. *In re CMS Energy Securities Litigation*, 403 F. Supp. 2d at 629-30.

Similarly, the Fieldgrove Trust has alleged transaction causation in accordance with Rule 8(a)(2). In addition to the allegations referenced in support of Rusty and Mary Jane Fieldgrove's transaction causation allegations, the Fieldgrove Trust alleges its receipt of the private placement memorandum for the Striker Series B Debentures (Fieldgrove Amended Complaint, ¶ 60), its purchase of the Striker Series B Debentures as a direct and proximate result of representations contained in the private placement memorandum, and the reliance upon the completeness and accuracy of the private placement memorandum (Fieldgrove Amended Complaint, ¶ 74), and its purchase of Striker Series B-2 Debentures in reliance upon representations contained in such private placement memorandum, and the accuracy and completeness of the representations contain in the private placement memorandum for the Striker Series B-2 Debentures (Fieldgrove Amended Complaint, ¶ 77).

The Talmage Trust also alleges transaction causation in accordance with Rule 8(a)(2). The Talmage Trust alleges Defendant Lawrence was the Trustee of the Talmage Trust at the time of the purchase of $492,000 of Striker Series B Debentures (Gibbs Amended Complaint, ¶ 55). The Talmage Trust alleges on information and belief, it purchased $492,000 of Striker Series B Debentures based upon untrue statements of material fact and omission of material facts of the Striker Series B Debenture private placement memorandum, and pleads the specific facts upon which the information and belief allegation is based (Gibbs Amended Complaint, ¶ 56), the execution of a subscription agreement for the purchase of $492,000 of Striker Series B

Debentures as a result of representations contained in the Striker Series B Debenture private placement memorandum (Gibbs Amended Complaint, ¶ 61), and reliance upon representations contained in the written documents and materials, which include the Striker Series B Debenture private placement memorandum (Gibbs Amended Complaint, ¶ 115).

The Plaintiffs need not allege, as argued by Direct Capital, each and every fact which would support the transaction causation element. Not even the heightened pleading requirements of the PSLRA require the allegation of every fact purporting every element. *Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1098-1100 (10th Cir. 2003) ("However, we agree with the courts that have concluded that "notwithstanding the use of the word 'all,' paragraph (b)(1) [of § 78u-4] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." (citations omitted)). *Id*. at 1098-99. Even under the PSLRA's heightened pleading requirements, the Tenth Circuit held the plaintiff's standard to be that if a reasonable person would believe that the defendant's statements were false and misleading, the plaintiff has sufficiently plead with particularity facts supporting its belief in the misleading nature of the defendant's statements. The Tenth Circuit took particular note that the PSLRA was designed to erect barriers to frivolous strike suits, not to make meritorious claims impossible to bring.  *Id*. at 1099-1100.  Causation is not subject to the heightened pleading requirements.  Plaintiffs have alleged receipt of the private placement memoranda, untrue statements of material fact and omission to state material facts contained within the private placement memoranda, and their purchase of Striker Series B and Series B-2 Debentures in reliance upon such representations, and the completeness and accuracy of the private placement memoranda.  These allegations are sufficient under Rule 8(a)(2) to allege

transaction causation.  Contrary to Direct Capital's argument, Plaintiffs do not have to allege a specific reading of the private placement memoranda or what pages they actually read upon which they based their reliance.  This may ultimately have relevance at trial.  However, at the pleading stage, and under Rule 8(a)(2), transaction causation has been adequately alleged.

4.       **"Attribution" is not Applicable in the Tenth Circuit.**

Citing Second Circuit law, Direct Capital argues the applicability of "attribution" in its argument that Plaintiffs have not adequately alleged transaction causation.  The Tenth Circuit has specifically rejected the Second Circuit's "attribution" requirement and it is not applicable in this Circuit.  *Securities and Exchange Commission v. Wolfson*, 539 F.3d 1249, 1259 (10th Cir. 2008). For a full discussion of the inapplicability of the Second Circuit's attribution rule in the Tenth Circuit see the Gibbs Trust's Response to Motion to Dismiss Secore & Waller, LLP pursuant to Fed.R.Civ.P. 12(b)(6), the section entitled "The Second Circuit's Attribution Rule is not Applicable in the Tenth Circuit," pp. 14-18 (Gibbs Doc. 87, pp. 14-18).

5.       **Plaintiffs Allege a Strong Inference of Scienter Against Direct Capital.**

Direct Capital argues that the Plaintiffs have not adequately alleged scienter under the PLSRA which requires that the Complaints state with particularity facts giving rise to a strong inference that Direct Capital acted with the required state of mind.  15 U.S.C. § 78u-4(b)(2). Scienter has been defined by the United States Supreme Court to mean a mental state embracing an intent to deceive, manipulate or defraud.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S. Ct. 1375, 47 L. Ed. 2d 688, n. 12 (1976).  The United States Supreme Court in *Ernst & Ernst* did not determine whether recklessness may be sufficient for establishing scienter.  *Id*.  The Tenth Circuit recognizes that recklessness satisfies the scienter requirement for violation of Section

10(b) and Rule 10b-5. *Hackbart v. Holmes*, 675 F.2d 114, 117 (10th Cir. 1982).  Recklessness is defined as conduct that is an extreme departure from the standards of ordinary care and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. *Anixter v. Home-Stake Production Company*, 77 F.3d 1215, 1232 (10th Cir. 1996).  In *City of Philadelphia v. Fleming Companies, Inc.* 264 F.3d 1245 (10th Cir. 2001), the Tenth Circuit reaffirmed the recklessness standard as sufficient to establish scienter and specified the requirements for pleading recklessness under the PSLRA. Under the standard established by the PSLRA, a plaintiff must plead facts raising a strong inference of intentional conduct or reckless conduct, which is conduct that is an extreme departure from the standards of ordinary care and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it. *Id.* at 1259-60.

In *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007), the United States Supreme Court clarified the standard by which Courts should determine whether a plaintiff has adequately plead the inference of scienter.  Initially, the Court noted that to qualify as "strong" the inference of scienter must be more than merely plausible or reasonable, but must be cogent and at least as compelling as any opposing inference of non-fraudulent conduct.  *Id.*  551 U.S. at 314, 127 S. Ct. at 2504-05.  *Webster's Third New International Dictionary*, 1158 (1986) defines "inference" as "the act of passing from one or more propositions . . . considered as true to another the truth of which is believed to follow from the former".  The Court in *Tellabs* established three guidelines to be followed where a District Court is faced with a Rule 12(b)(6) motion to dismiss a Section 10(b) claim for failure to

adequately plead scienter.  The first is that the Courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.  *Tellabs*, 551 U.S. at 322, 127 S. Ct. at 2509.  Secondly, the District Court must consider the complaint in its entirety as well as other sources ordinarily examined when ruling on 12(b)(6) motions to dismiss, in particular, documents referred to in the complaint and matters of which the Court may take judicial notice.  The inquiry is then whether all facts alleged, <u>taken collectively</u>, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard.  *Id*., 551 U.S. at 322-23, 127 S. Ct. at 2509.  Finally, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the Court must take into account plausible opposing inferences.  *Id*., 551 U.S. at 323, 127 S. Ct. at 2509-10.

The *Tellabs* Court also provided additional guidance.  The strength of the inference cannot be decided in a vacuum.  The inquiry is inherently comparative.  To determine whether a plaintiff has alleged facts that give rise to the required strong inference of scienter, the Court must consider plausible non-culpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acting with scienter need not be irrefutable or a smoking gun or even the most plausible of competing inferences.  *Id*., 551 U.S. at 323-24, 127 S. Ct. at 2510.  A complaint will survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.  *Id*., 551 U.S. at 324, 127 S. Ct. at 2510.  In sum, when the <u>allegations are accepted as true</u> and <u>taken collectively</u>, would a reasonable person deem the inference of scienter at least as strong as any opposing inference.  *Id*., 551 U.S. at 326, 127 S. Ct.

at 2511.  Subsequent to *Tellabs*, the Second Circuit in *ECA v. JP Morgan Chase Company*, 553 F.3d 187, 199 (2nd Cir 2009) recognized at least four separate circumstances which may give rise to a strong inference of the requisite scienter.  These circumstances are where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberate illegal behavior, (3) knew facts and had access to information suggesting that their public statements were not accurate, and/or (4) failed to check information they had a duty to monitor.

The issue for this Court's determination is whether Plaintiffs' First Claim for Relief adequately alleges scienter against Direct Capital.  Plaintiffs allege that Direct Capital violated Section 10(b) and Rule 10b-5 by failing to conduct a reasonable, prudent, full, and thorough due diligence investigation which resulted in the sale to the Plaintiffs of Series B and Series B-2 Debentures by means of untrue statements of material fact, omission to state material facts, and deceptive acts and practices, all within the meaning of Section 10(b) and Rule 10b-5.  Due diligence is in effect a negligence standard.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S. Ct. 1375, 1388, 47 L. Ed. 2d 668 (1975); *In re Software Toolworks, Inc. Litigation*, 50 F.3d 615, 621 (9th Cir. 1995).  However, an underwriter may be subject to liability under Section 10(b) upon the plaintiff's showing that the underwriter acted with scienter by either showing actual knowledge or recklessness.  *Aaron v. SEC*, 446 U.S. 680, 696, 100 S. Ct. 1945, 1955, 64 L. Ed. 2d 611 (1980); *In re USA Classic Securities Litigation*, 1995 W.L. 363841 at *5 (S.D. N.Y. 1995).  *In re Enron Corporation Securities, Derivative and ERISA Litigation*, 235 F. Supp. 2d 549, 612 (S.D. Tex. 2002).  In this case, Plaintiffs have alleged more than negligence having alleged scienter within the recklessness standard of the Tenth Circuit.

An underwriter occupies a vital position in a securities offering and by its participation in the sale of securities, the underwriter makes a recommendation that implies that the underwriter has a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents used in the offering.  Exchange Act Release No. 26100, 41 SEC Docket 1131, 1988 W.L. 999989 at *20 (September 22, 1988).   As observed by the Securities and Exchange Commission in the foregoing Release, the underwriter's obligation to have a reasonable basis for belief in the accuracy of statements directly made concerning the offering is underscored when a broker-dealer underwrites securities.  *Id.* at *21.

Numerous courts have recognized the importance of the role of an underwriter in a securities offering.  Underwriters are under a duty to investigate and a violation of that duty brings them within the term "willful" in the Securities Exchange Act of 1934 ("34 Act").  *Hanly v. Securities and Exchange Commission*, 415 F.2d 589, 595-96 (2nd Cir. 1969).  An underwriter has a duty to investigate an issuer and it may be liable under Rule 10b-5 for reckless failure to do so.  *Sanders v. John Nuveen & Company*, 554 F.2d 790, 793 (7th Cir. 1977).  *SEC v. Dain Rauscher*, 254 F.3d 852, 857-58 (9th Cir. 2001) (recognizing an underwriter may be liable under Section 10(b) and Rule 10b-5 for a reckless failure to satisfy its duty of investigation).   In *Sanders*, the Seventh Circuit noted that the role of an underwriter is critical to the integrity of market and the confidence of the investing public, stating:

> An underwriter's relationship with the issuer gives the underwriter access to facts that are not equally available to members of the public who must rely on published information.  And the relationship between the underwriter and its customers implicitly involves a favorable recommendation of the issued security.  Because the public relies on the integrity, independence and expertise of the underwriter, the underwriter's participation significantly enhances the marketability of the security.  And since the underwriter is unquestionably aware of the nature of the public's reliance on its participation in the sale of the issue,

the mere fact that he has underwritten it is an implied representation that he has met the standards of his profession in his investigation of the issuer [footnotes omitted].

*Sanders*, 524 F.2d at 1070.

The Second Circuit has observed:

Self regulation is the mainspring of the federal securities laws.   No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter.   He is most heavily relied upon to verify published materials because of his expertise in appraising the securities issue and the issuer, and because of his incentive to do so.   He is familiar with the process of investigating the business condition of a company and possesses extensive resources for doing so.   Since he often has a financial stake in the issue, he has a special motive thoroughly to investigate the issuer's strengths and weaknesses.   Prospective investors look to the underwriter, a fact well known to all concerned and especially to the underwriter, to pass on the soundness of the security and the correctness of the registration statement and prospectus.

*Chris-Craft Industries, Inc. v. Piper Aircraft Corp.* 480 F.2d 341, 370 (2nd Cir. 1973), cert.

denied 414 U.S. 910, 94 S. Ct. 231, 232, 39 L. Ed. 2d 148 (1973).

When the security offered is not offered pursuant to registration requirements of federal

and state law and there is no reliable published information about the issuer or the security, the

role of the underwriter and its duty to investigate is even more critical.   In *Hanly*, the court

recognized this imposes a special duty upon those who sell such securities not to take advantage

of customers.   By recommending such a security, the underwriter represents he has made a

reasonable investigation and that the information provided is based upon such a reasonable

investigation.   *Hanly*, 415 F.2d at 597.   Also see, SEC Release No. 6721 (February 2, 1962),

*Distribution by Broker-Dealers of Unregistered Securities* recognizing the requirement of

broker-dealers to conduct a reasonable investigation prior to offering for sale unregistered

securities.   Underwriters must exercise a high degree of care of investigation and independent

verification of a company's representations.   *Feit v. Leasco Data Processing Equipment Corp.*,

332 F. Supp. 544, 582 (E.D. N.Y. 1971).  As a consequence, courts must be particularly scrupulous in examining their conduct.  *Id.* at 581.  An underwriter may not blindly rely upon information provided to it and where "red flags" arise, must particularly investigate such warnings.  *In re WorldCom Securities Litigation*, 346 F. Supp. 2d 628, 672 (S.D. N.Y. 2004).  Courts insist that underwriters conduct meaningful investigations which has been deemed to include reasonable investigation of unaudited financial information.  *Glassman v. ComputerVision Corp.*, 90 F.3d 617, 629 (1st Cir. 1996).  An underwriter's due diligence investigation which was found cursory and thus insufficient has been held to satisfy the scienter recklessness standard.  *Everest Securities, Inc. v. Securities and Exchange Commission*, 116 F.3d 1235, 1239 (8th Cir. 1997); *Kaplin v. Rose*, 49 F.3d 1363, 1380 (9th Cir. 1994), cert. denied 116 S. Ct. 58 (1995).

The major objective of federal securities laws is the protection of the investing public.  *SEC v. Capital Gains Research Bureau*, 375 U.S. at 195.  At the heart of the congressional concern in enacting the securities laws was where the abuse is committed within the industry, especially by brokers.  *Berner v. Lazzaro*, 730 F.2d 1319, 1322 (9th Cir. 1984).  Section 10(b) was specifically created to prescribe fraudulent misrepresentations and concealment of material facts by brokers and dealers.  *Id.*   The underwriter who does not make a reasonable investigation is derelict in his responsibilities to deal fairly with the investing public.  41 SEC 398, 1963 W.L. 63647 (February 27, 1963).  An underwriter has a clearly defined and unquestionable obligation to conduct a reasonable due diligence investigation of any security which it offers.  This reasonable due diligence investigation requirement is well established in the law.  Further, it is well recognized in the law that an underwriter's failure to conduct a reasonable due diligence

investigation may go beyond mere negligence and subject an underwriter to liability under Section 10(b) and Rule 10b-5.

A cursory due diligence investigation by Direct Capital would have easily discovered the following material misrepresentations:

a.     That an independent third party trustee had not been appointed for the Series A Debentures and Series B Debentures.  This determination would have required little more than requiring Striker to identify the individual appointed as the "independent third party trustee" and Direct Capital's contact with such person to ascertain his actual appointment and his relationship with Striker.  Clearly Direct Capital either failed to investigate this specific fact, as it easily would have discovered the appointment of Steve Holmes, an executive officer and general counsel to Striker, or, alternatively, and even more egregious, Direct Capital inquired and discovered Steve Holmes' appointment and knew that the representations regarding appointment of an independent third party trustee were false.  In either event, scienter exists.

b.     The financial statements contained in the Private Placement Memoranda do state they are unaudited.  To the unsophisticated, such financial statements, on their face, may appear reasonable and legitimate.  However, to the sophisticated individual and, in particular to an underwriter such as Direct Capital, such financial statements are clearly simplistic and constitute a "red flag" which warranted diligent and specific investigation into by Direct Capital.  In view of the amount by which the assets in the financial statements were overstated (Striker Litigation Complaint, ¶ 25-26), a reasonable investigation would have uncovered an over-valuation of assets of as much as 413% (Striker Litigation Complaint, ¶25).  Direct Capital failed to obtain any reliable financial information from Striker, as reliable financial information would have

disclosed the falsity of the financial statements and the fraudulent Ponzi scheme.  This failure is particularly egregious when in four offerings preceding the offering of the Series B Debentures, Striker raised as much as $73,400,000.  Direct Capital clearly could have insisted on reliable financial information, such as audited financial statements, and Striker clearly could have afforded audited financial statements based upon having raised as much as $73,400,000 in prior securities offerings.

      c.     A cursory due diligence investigation would have included a particularly diligent investigation as to the use of proceeds of past securities offerings.  This may be subsumed within the requirement of obtaining reliable financial data and information; however, it is clearly an important and significant fact when an underwriter is engaged in participating in an ongoing series of offerings of a significant magnitude by an issuer such as Direct Capital did with Striker. Direct Capital, as the "managing broker-dealer" was in a position to insist upon such information from Striker and either failed to do so, or did so and knew that Striker was not using proceeds as represented in the Confidential Private Placement Memoranda.  In either case, scienter exists.

      d.     A significant aspect of the Debenture offerings was the representations in the Confidential Private Placement Memoranda that the Debentures would be collateralized and the amount by which the Debentures would be collateralized.  Once again, a cursory due diligence examination of the Series A Debenture offering and the collateralization of Debentures in such offering would have revealed the true nature and extent of their collateralization.  In this material respect, Direct Capital either failed to conduct even such a cursory due diligence review of such matter or, if it did so, it then knew of the untrue material statements regarding collateralization of the Debentures.  Again, in either case, scienter on the part of Direct Capital exists.

The allegations of the Complaints, the Striker Litigation Complaint, the Form D's of four prior Striker offerings in which Direct Capital participated and offered $73,400,000 of Striker securities over a two year period preceding the Series B Debentures, and the Confidential Private Placement Memoranda of the Series A, Series B, and Series B-2 Debentures give rise to a strong inference that Direct Capital's failure to conduct a reasonable due diligence investigation, is an extreme departure from the standards of ordinary care in the securities industry which presents and did present a danger of misleading investors in the Series B and Series B-2 Debentures, such as the Plaintiffs.   Plaintiffs have therefore adequately alleged that in failing to conduct a reasonable due diligence investigation, Direct Capital acted with recklessness.   Plaintiffs have adequately stated the claim for violation of Section 10(b) and Rule 10b-5 against Direct Capital and therefore Direct Capital's Motion to Dismiss Plaintiffs' First Claim for Relief should be denied.

**6.      Corporate Scienter is Adequately Alleged.**

Direct Capital argues that in the absence of alleging a strong inference of scienter on behalf of a specific corporate officer or director, scienter cannot be alleged against a corporation. This is not true.  A strong inference of corporate scienter may be drawn without a plaintiff being able to name the individuals who concocted or disseminated the fraud.  *Makor Issues & Rights, Ltd. v. Tellabs*, 513 F.3d 702, 710 (7th Cir. 2008).   The Seventh Circuit used the example of General Motors issuing a false announcement as to sales.  The Seventh Circuit held there would be a strong inference of corporate scienter since an announcement, dramatically false, would have to have been approved by corporate officials sufficiently knowledgeable about the company to know the announcement was false.  Similarly, in a small company, such as Direct Capital, one

individual, whose position as the owner, Chief Executive Officer, and licensed as a general principal, would have had to have been aware of the acts and omissions of Direct Capital.

In addition to having alleged corporate scienter directly against Direct Capital, Plaintiffs have alleged scienter on behalf of its Chief Executive Officer and licensed general principal, Womack. The allegation of scienter of a controlling person of a corporation is sufficient to allege corporate scienter. *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2000). In *Makor*, the Seventh Circuit held that the CEO, the individual at the top of the corporate pyramid, was likely to know of the false statements based upon his position as the CEO. *Makor* at 711. Plaintiffs have alleged Womack's position as an Officer and Director of Direct Capital as well as Direct Capital's owner, TIC Capital (Fieldgrove Amended Complaint, ¶ 22; Gibbs Amended Complaint, ¶ 24). Also see, TIC Capital Firm Brochure (Gibbs Doc. 89-6) confirming Womack's position and control of Direct Capital. Plaintiffs have alleged that Womack owed a duty to conduct a due diligence investigation, his failure to conduct such a due diligence investigation, and what manner he failed to conduct a due diligence investigation, his duty to supervise those engaged in selling Striker Series B and Series B-2 Debentures, and specifically how he breach such duty (Fieldgrove Amended Complaint, ¶¶ 89-92; Gibbs Amended Complaint, ¶¶ 87-90). Accepted as true and taking collectively, there are sufficient facts before this Court to not only support a strong inference of corporate scienter against Direct Capital, but also a strong inference of scienter against Womack. Womack's scienter, because he is a controlling person of Direct Capital, is imputed to Direct Capital. Plaintiffs have alleged scienter against Direct Capital as required under the PSRLA.

**7.      Plaintiffs Adequately Allege Loss Causation.**

Loss causation, like transaction causation, must only be generally alleged under Rule 8(a)(2). *In re CMS Energy Securities Litigation*, 403 F. Supp. 2d at 629-30. *ABN AMRO v. Capital Intern. Ltd.*, 595 F. Supp. 2d at 845-46. The loss causation element requires that plaintiffs allege economic harm occurred as a result of defendant's acts and omissions. *Kalnit v. Eichler*, 85 F. Supp. 2d at 240. Plaintiffs have alleged that as a direct and proximate result of Defendants' acts and conduct, they suffered a loss of their investments in the Series B and Series B-2 Striker Debentures (Fieldgrove Amended Complaint, ¶ 117; Gibbs Amended Complaint, ¶ 16). Nothing more is required under Rule 8(a)(2).

### Plaintiffs Have Alleged Controlling Person Liability Under Section 20(a)

To state a *prima facie* case of controlled person liability under Section 20(a), a plaintiff must allege: (1) a primary violation of the securities laws; and (2) "control" over the primary violator by the alleged controlling person. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d at 1107. Plaintiffs have already addressed the first element above, the primary violation of Section 10(b) and Rule 10b-5 committed by Direct Capital, the alleged controlled person (Fieldgrove Amended Complaint, ¶ 121; Gibbs Amended Complaint, ¶ 120).

17 C.F.R. § 230.405 defines "control" for purposes of the securities laws as:

> [t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of owning securities, by contract, or otherwise.

To make this showing, the plaintiffs must point to facts which indicate the defendants had both possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of owning securities, by contract, or otherwise. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998).

The allegations of the Complaints, together with those documents of which this Court may properly take judicial notice in determining a Rule 12(b)(6) motion, point to facts that Defendants had direct or indirect possession of the power to direct or cause the direction of the management and policies of Direct Capital.  The Complaints allege that, through direct or indirect ownership, each of TIC Capital, Pacific Security Partners, Womack, and Pacific Security directed the management and policies of Direct Capital (Fieldgrove Amended Complaint, ¶¶ 20-23; Gibbs Amended Complaint, ¶¶ 22-26).   The Broker Check Report of Direct Capital Securities, Inc. (Gibbs Doc. 89-2) as filed by Direct Capital with FINRA, states the following:

1.      TIC Capital owns seventy-five percent or more of Direct Capital and directs the management and policies of Direct Capital.

2.      Pacific Security Partner, through TIC Capital, owns seventy-five percent or more of Direct Capital and directs the management and policies of Direct Capital.

3.      Pacific Security, through TIC Capital, owns Direct Capital and directs the management and policies of Direct Capital.

4.      Womack, through Pacific Security, owns seventy-five percent or more of Direct Capital and directs the management and policies of Direct Capital.

5.      The Annual Audited Report, Form X-17A-5, Part III of Direct Capital for the years ending December 31, 2006, 2007, and 2008 (Gibbs Doc. 89-3, 89-4, and 89-5) state that Direct Capital is a wholly owned subsidiary of TIC Capital and thus TIC Capital through voting securities has the ability to direct the management and policies of Direct Capital.

Plaintiffs have alleged "control" within the meaning of the securities laws, through the ownership of voting securities, by each of TIC Capital, Pacific Security Partners, Pacific

Security, and Womack, as well as "control" by Womack by virtue of his corporate position. Further, the Direct Capital Defendants' own filings with the regulatory agencies with which Direct Capital is licensed, FINRA, and the SEC, admit the existence of control by each of TIC Capital, Pacific Security, Pacific Security Partners, and Womack.  Plaintiffs have adequately stated a claim under Section 20(a) against TIC Capital, Pacific Security Partners, Pacific Security, and Womack.

### The Plaintiffs Allege the Direct Capital Defendants' Violation of the Texas Securities Act

The Texas Securities Act is a broad remedial statute intended to protect Texas residents and non-Texas residents alike from securities fraud emanating from Texas.   *In re Enron Securities, Derivative & ERISA Litigation*, 235 F. Supp. 549, 691-92 (S.D. Tex. 2003); *Baron v. Strassner*, 7 F. Supp. 2d 781, 785 (S.D. Tex. 1998).  In order to implement this remedial purpose, the Texas courts have broadly interpreted the provisions of the Texas Securities Act.

1.    **Fraudulent Conduct Occurred Within the State of Texas.**

The Texas Securities Act applies if any act connected with the selling process of securities covered by the Texas Securities Act occurred in Texas.  *Baron v. Strassner*, 7 F. Supp. 2d at 875.  In its argument, Direct Capital's attorney states Direct Capital was based in California and "[t]here are no facts alleged that DCS took any acts in Texas that affected Plaintiffs."  (Gibbs Doc. 74-1, p. 16).  There is no basis upon which the Court can accept such statement.  It is not contained in an Affidavit nor is there any document or evidence before the Court which would support such statement.  Further, even if the Court were to accept such statement as true, that Direct Capital may not have been based in Texas, does not mean it did not commit acts governed by the Texas Securities Act in Texas.  To the contrary, even if Direct Capital was based

elsewhere than Texas, the fact that it served as Dealer-Manager for the Series B and Series  B-2

Debentures purchased by the Plaintiffs, as well as the Dealer-Manager for the preceding Series A

Debentures, and participated in four other offerings of securities preceding the Series A

Debentures of Striker, Striker being located in Dallas, Texas, renders it extremely likely that the

acts which Plaintiffs allege give rise to liability against Direct Capital and the other Direct

Capital Defendants, certainly occurred, in part, in Texas.  Plaintiffs have alleged Direct Capital

Defendants' location in Texas (Fieldgrove Amended Complaint, ¶¶ 19-23; Gibbs Amended

Complaint, ¶¶ 21-26) and Striker's fraudulent Ponzi scheme which emanated from Dallas, Texas

(Fieldgrove Amended Complaint, ¶¶ 28-35; Gibbs Amended Complaint, ¶¶ 31-38).  (Also see,

Striker Litigation Complaint, Miles Doc. 48-2).  At the pleading stage, these factual allegations

must be accepted as true.  Further, there is no other evidence before this Court contradicting such

allegations.  The Texas Securities Act is thus applicable to the conduct alleged against the Direct

Capital Defendants.

**2.**      **Plaintiffs Allege a Direct Violation by Direct Capital of Section 33(A)(2).**

The Plaintiffs allege that Direct Capital violated the Texas Securities Act by violating

Section 33A(2) (Fieldgrove Amended Complaint, ¶ 125; Gibbs Amended Complaint, ¶ 149).  In

relevant part, Section 33A(2) provides:

> A person who offers or sells a security . . . by means of an untrue statement of
> material fact or an omission to state a material fact necessary in order to make the
> statements made, in light of the circumstances under which they are made, not
> misleading, is liable to the person buying the security from him . . . .

The Direct Capital Defendants suggest a number of inadequacies in Plaintiffs' pleading of a

violation of Section 33A(2) against Direct Capital.  The Plaintiffs' claims under the Texas

Securities Act incorporate the allegations forming the basis of Direct Capital's violation of

Section 10(b). The requirements for a violation of Section 33A(2) are merely the offer or sale of a security by means of an untrue statement of material fact or omission to state a material fact. There is no requirement to allege or prove scienter on the part of the defendant. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343-44 (5th Cir. 2008). There is no requirement that the buyer rely upon the misrepresentations or omissions. *In the Matter of Westcap Enterprises*, 230 F.3d 717, 726 (5th Cir. 2000). Under Texas law, a statement or omission is material if there is an appreciable likelihood that it could have a significant effect upon the investment decisions of a reasonable investor by substantially altering the information available to him in deciding whether to invest. *Id*. Plaintiffs have alleged the requisite elements.

Direct Capital suggests that "[n]o representations [where made] to plaintiffs" (Gibbs Doc. 74-1, p. 16). No further explanation of this statement is provided. Plaintiffs acknowledge none of the Direct Capital Defendants had a direct communication with them. However, false representations and omissions were made through the private placement memoranda. This issue is easily resolved by reference to the definition of "sale," "offer to sell," and "sell" of the Texas Securities Act, Vernon's Ann., Tex. Civ. St., Art. 581-4E which provides the following:

> The terms "sale" or "offer for sale" or "sell" shall include every disposition, or attempt to dispose of a security for value. The term "sale" means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or other things of value, or any transfer or agreement to transfer, in trust or otherwise. . . . The term "sell" means any act by which a sale is made and the term "sale" or "offer for sale" or "sell" shall include a subscription, an option for sale, a solicitation for sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly or by an agent, by a circular, letter, or advertisement or otherwise, . . . . Nothing herein shall limit or diminish the full meaning of the terms "sale," "sell" or "offer for sale" as used by or accepted in courts of law or equity. (emphasis added)

As the Dealer-Manager, whose name is prominently displayed on the cover of the private

placement memoranda for the Striker Series B and Series B-2 Debentures, the private placement memoranda are an "offer for sale" by Direct Capital within the meaning of the Texas Securities Act and thereby, the representations contained within the private placement memoranda were made to the Plaintiffs.

Direct Capital also suggests that the alleged untrue statements of material fact were not material. Direct Capital says nothing about the alleged omissions. The alleged untrue statements of material fact are not statements of predictions but are allegations of untrue statements of material fact. Even the Direct Capital Defendants acknowledged the alleged misrepresentations of the financial statements are misrepresentations of existing facts (Gibbs Doc. 74-1, p. 6). Further, the alleged untrue statements of material fact that there existed an independent third party trustee for the debentures when, in fact, there was not is a misrepresentation of existing facts. The alleged misrepresentations concerning the use of proceeds are misrepresentations of existing facts as the allegations are framed such that at the time they were made, they were known to be untrue. The alleged untrue statements of material fact, as well as the omissions, meet the definition of materiality under Texas law as there is an appreciable likelihood they significantly affected the investment decisions of a reasonable investor by substantially altering the information available.

Direct Capital makes the assertion that the Talmage Trust alleges Dennis R. Lawrence ("Lawrence") as Trustee of the Talmage Trust knew of the claimed false statements in the private placement memoranda for the Striker Series B Debentures thereby precluding recovery of the Talmage Trust under Section 33A(2). Direct Capital does not cite to the paragraph in the Gibbs Amended Complaint where such allegation can be found. In fact, what Plaintiffs allege in

paragraph 54 of the Gibbs Amended Complaint is that Lawrence's representation the Striker Series B Debenture investment was safe and secure was false and misleading because it is a basic premise of investing that higher returns equal greater risk, and thus Lawrence knew or should have know such statement was false.  Plaintiffs have set forth a claim against Direct Capital for a violation of Section 33A(2).

3.      **Plaintiffs Allege a Section 33F(1) Violation.**

Plaintiffs have alleged a Section 33F(1) violation of the Texas Securities Act by Womack, TIC Capital, Pacific Security Partners, and Pacific Security.  Section 33 F(1) provides in relevant part the following:

> A person who directly or indirectly controls a seller, . . . is liable under Section 33A jointly and severally with the seller . . . and to the same extent as if he were the seller . . .

Section 33F(1) goes on to provide the controlling person with an affirmative defense, if the controlling person can sustain the burden of proof of not knowing of the existence of the facts by reason of which liability is alleged to exist.

Section 20(a) parallels Section 33F(1), providing in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be jointly and severally liable with and to the same extent as such controlled person . . .

For the same reasons that TIC Capital, Pacific Security Partners, Pacific Security, and Womack are liable as controlling persons under Section 20(a), they are liable as controlling persons under Section 33F(1).

4.      **Plaintiffs Allege a Section 33F(2) Violation.**

The Plaintiffs have alleged that TIC Capital, Pacific Security Partners, Pacific Security,

and Womack violated Section 33F(2) by materially aiding Direct Capital's violation of Section 33A(2) (Fieldgrove Amended Complaint, ¶ 127; Gibbs Amended Complaint, ¶ 152) and that the Direct Capital Defendants violated Section 33F(2) by materially aiding Striker which violated Section 33A(2) (Fieldgrove Amended Complaint, ¶ 128; Gibbs Amended Complaint, ¶ 153). To state a claim for aider and abettor liability under Section 33F(2), a plaintiff must alleged: (1) a primary violation of the securities laws; (2) that the aider and abettor had a general awareness of his role in the violation; (3) that he gave substantial assistance in the violation; and (4) that he intended to deceive the plaintiff or acted with reckless disregard for the truth of the primary violator's misrepresentation. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d at 344. Acts and conduct of both Direct Capital and Striker in violation of Section 33A(2) have been alleged in the Complaints (Fieldgrove Amended Complaint, ¶¶ 19-23, 28-35, 61, 62, 78, 80-93; Gibbs Amended Complaint, ¶¶ 21-25, 31-38, 57, 58, 78-90).

Elements two, three and four are intertwined. *Sterling Trust Company v. Adderley*, 168 S.W.3d 835, 842 (Tex. 2005). The Texas Supreme Court held that reckless disregard of the truth or law means that an alleged aider can only be liable if it rendered assistance "in the face of a perceived risk" that its assistance would facilitate untruth or illegal activity by the primary violator (citing Section 33F(2)). The Texas Supreme Court went on to hold that in order to perceive such a risk, the alleged aider must possess a general awareness that his role was part of an overall activity that is improper. *Id*. Stated differently, in addition to a primary violation, to state a Section 33F(2) claim, a plaintiff must allege an aider possessed a general awareness of its role in the overall activity which is improper, in the face of perceived risk that its assistance would facilitate untruthful or illegal activity. If the aider does so, it has acted with reckless

disregard of the truth.   The Plaintiffs have alleged in detail Direct Capital's role in Striker's fraudulent Ponzi scheme as well as Striker's fraudulent Ponzi scheme.   Based upon the  Direct Capital Defendants' role in acting as a Broker-Dealer and/or Managing Broker-Dealer for a several year period, the Plaintiffs have alleged the Direct Capital Defendants rendered substantial assistance to the primary violator, Striker.  TIC Capital, through the management agreement with Direct Capital, and Womack, as CEO and the licensed securities principal of Direct Capital, rendered substantial assistance to Direct Capital.  Plaintiffs' allegations of failure to conduct an adequate due diligence investigation created a perceived risk.   In offering and selling the debentures in Striker's fraudulent Ponzi scheme, the Direct Capital Defendants rendered substantial assistance in the face of such perceived risk as has been alleged in the Complaints. Such allegations are sufficient to allege a violation of Section 33F(2).

### The Plaintiffs Have Alleged Common Law Fraud Against the Direct Capital Defendants

The elements for a common law fraud claim in Wyoming are:  (1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff relied on the false representation and suffered damages.  *Birt v. Wells Fargo Home Mortgage, Inc.*, 75 P.3d 640, 656 (Wyo. 2003). The Seventh Claim for Relief (Fieldgrove case) and the Eleventh Claim for Relief (Gibbs case) state all of the elements of a common law fraud claim against the Direct Capital Defendants. Each of the Plaintiffs' fraud claims incorporates by reference all of the preceding paragraphs, which is proper.  Fed.R.Civ.P. 10(c).  The elements of a common law fraud claim are essentially no different than those of a Section 10(b) claim.  Having satisfied the heightened pleading requirements of the PSLRA, Plaintiffs have therefore satisfied the pleading requirements of a

common law fraud, including to plead fraud with the particularity required by Rule 9(b). *In re Qwest Communications International, Inc. Securities Litigation*, 387 F. Supp. 2d 1130, 1153 (D.Colo. 2005).

Contrary to the Direct Capital Defendants'' assertions that Plaintiffs were warned of the risks of the investments, they were not.  There was no disclosure in the private placement memoranda that:  (1) an independent third party trustee may, in fact, not be appointed; (2) the financial statements, although unaudited, may be false and misleading; and (3) proceeds raised from investors in the Series B and Series B-2 Debenture offerings may be used to pay promised returns to investors in earlier offerings.  None of these facts were readily available to the Plaintiffs nor would any diligent inquiry on behalf of the Plaintiffs uncover such facts.  The Plaintiffs were in a far different position than the Direct Capital Defendants to uncover such facts.

<u>**The Plaintiffs State a Claim for Civil Conspiracy**</u>
<u>**Against the Direct Capital Defendants**</u>

Wyoming Statute § 1-1-109 is a comparative fault statute.  No Wyoming Court has held that it preempts a civil conspiracy cause of action.  In Wyoming, a civil conspiracy requires an unlawful objective, a meeting of the minds with regard to that objective, and a means of obtaining the objective, one or more overt acts, and damages as a proximate result thereof. *Moore v. Wyoming Medical Center*, 825 F. Supp. 1531, 1550 (D. Wyo. 1993).  The Eighth Claim for Relief (Fieldgrove case) and the Twelfth Claim for Relief (Gibbs case) allege a civil conspiracy among Direct Capital and CapWest Securities, Inc. ("CapWest").  The Plaintiffs allege an agreement between Direct Capital and CapWest to offer and sell to the Plaintiffs, and others, Striker debentures (Fieldgrove Amended Complaint, ¶ 160; Gibbs Amended Complaint, ¶

194); that in order to accomplish said purpose and objectives, meetings and discussions among representatives of Direct Capital and CapWest between July of 2006 and September of 2007 (Fieldgrove Amended Complaint, ¶ 161; Gibbs Amended Complaint, ¶ 195); specifics of the agreements to accomplish the purpose of selling fraudulent debentures (Fieldgrove Amended Complaint, ¶ 162; Gibbs Amended Complaint, ¶ 196); the commission of unlawful overt acts as alleged in the Complaints, including but not limited to, violations of federal securities laws (Fieldgrove Amended Complaint, ¶ 163; Gibbs Amended Complaint, ¶ 197); and injury and damage as a direct and proximate result of such unlawful civil conspiracies (Fieldgrove Amended Complaint, ¶ 164; Gibbs Amended Complaint, ¶ 198).

All of the requisite elements are alleged.  Further, all of the paragraphs immediately preceding the claim for civil conspiracy are incorporated by reference into such claim. Accepting as true, which the Court must, the well plead facts, Plaintiffs have alleged a civil conspiracy claim against Direct Capital.

### The Plaintiffs Have Alleged the Negligence Claim
### Against the Direct Capital Defendants

The elements of a negligence claim in Wyoming are:  (1) the defendant owed the plaintiff a duty to conform to a specified standard of care; (2) the defendant breached the duty of care; (3) the defendant's breach of the duty of care proximately caused injury to the plaintiff; and (4) that injury sustained by plaintiff is compensable by money damages. *Birt v. Wells Fargo Home Mortgage, Inc.*, 75 P.3d at 658.  Plaintiffs have alleged all of these elements.  Plaintiffs allege: (1) a duty of Direct Capital to conduct a full, complete, thorough, prudent and reasonable due diligence investigation of the Striker Series B and Series B-2 Debentures (Fieldgrove Amended Complaint, ¶ 89; Gibbs Amended Complaint, ¶ 87); (2) a breach of this duty by Direct Capital

(Fieldgrove Amended Complaint, ¶ 90; Gibbs Amended Complaint, ¶ 88); (3) all Defendants, including the Direct Capital Defendants, directly or indirectly aided and abetted and/or directly or indirectly controlled, thus aiding and abetting, others in the sale of the Striker Series B and Series B-2 Debentures to the Plaintiffs (Fieldgrove Amended Complaint, ¶ 166; Gibbs Amended Complaint, ¶ 200); (4) the Direct Capital Defendants' breach of such duty proximately caused injury to the Plaintiffs (Fieldgrove Amended Complaint, ¶ 168 Gibbs Amended Complaint, ¶ 202); and (5) Plaintiffs sustained injury as a direct and proximate result of such conduct (Fieldgrove Amended Complaint, ¶ 168; Gibbs Amended Complaint, ¶ 202). Plaintiffs' injuries representing loss of their purchase price on the Striker Series B and Series B-2 Debentures is compensable by money damages. Plaintiffs have stated a negligence claim against all of the Direct Capital Defendants.

## CONCLUSION

The granting of a Motion to Dismiss is a harsh remedy which must be cautiously studied not only to effectuate the spirit of the liberal rules of pleading, but to protect the interests of justice. *Phillips v. Bell*, 2010 W.L. 517629 (10th Cir. 2010). At this stage of the proceedings, when ruling on a Motion to Dismiss, the Court must accept all of the allegations as true. *Robbins v. Oklahoma*, 519 F.3d at 1247. The Court may also consider documents referred to in the Complaints as well as public records, including pleadings filed in other federal courts and with the Securities and Exchange Commission.

In this case, Plaintiffs were the victims of a complex fraudulent Ponzi scheme in which the Direct Capital Defendants played an essential role with Direct Capital serving as the Broker-Dealer and Managing Broker-Dealer. It is almost irrefutable that Plaintiffs were the victims of a

fraudulent Ponzi scheme.  The role of Direct Capital, as a Broker-Dealer, in the securities sold under the fraudulent Ponzi scheme, is also irrefutable.  Direct Capital had a two year relationship with Striker preceding the offering of the Series B and Series B-2 Debentures.  Direct Capital was involved in four of Striker's securities offerings preceding its participation in the Series B Debenture offering.  The Securities and Exchange Commission and the federal courts have made it clear the essential role broker-dealers play and the importance of maintaining the integrity of the securities markets.  Direct Capital was far more than merely negligent in its due diligence investigation.  The matters which the Plaintiffs have alleged Direct Capital failed to uncover in its due diligence investigation are basic and, in view of the lengthy prior relationship, would have ordinarily been uncovered by even a cursory due diligence investigation.  Direct Capital's due diligence investigation, if any, is well below the standard of care so as to be an extreme departure from the standards of ordinary care such that they presented a danger of misleading and, in fact, did mislead buyers of the Striker Series B and Series B-2 Debentures.  Direct Capital has acted with scienter.

For the reasons set forth herein, Plaintiffs' Complaints adequately set forth claims for relief against the Direct Capital Defendants and therefore the Direct Capital Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) should be denied.

Respectfully submitted this 8th day of October, 2010.

DAVIS & CANNON, LLP

By: __s/_____
J. Mark Stewart
422 West 26th Street
P.O. Box 43
Cheyenne, WY 82003
Telephone:     (307) 634-3210
Facsimile:     (307) 778-7118
mark@davisandcannonchey.com


Kim D. Cannon
DAVIS & CANNON, LLP
40 South Main
P.O. Box 728
Sheridan, WY 82801
Telephone:     (307) 672-7491
Facsimile:     (307) 672-8955
cannon@davisandcannon.com


John A Hutchings (*pro hac vice*)
DILL DILL CARR STONBRAKER
   & HUTCHINGS, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone:            (303)777-3737
Facsimile:     (303) 777-3823
jhutchings@dillanddill.com

Attorneys for Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing on the 8th day of October, 2010 to the following:

Jeffrey C Brinkerhoff
Mark W. Gifford
Gifford & Brinkerhoff
jeff@giffordbrinkerhoff.com
mark@giffordbrinkerhoff.com

K Lawson Pedigo
Miller Keffer Bullock & Pedigo
KLPedigo@mkp-law.net

David A. Baugh
Baugh Dalton Carlson & Ryan, LLC
dbaugh@baughdaltonlaw.com

Charles W. Gameros, Jr.
Hoge & Gameros
bgameros@legaltexas.com

Thomas N Long
Laura Jean Jackson
Long Reimer Winegard
tlong@lrw-law.com
ljackson@lrw-law.com

David F. DeFazio
DeFazio Law Office
david@defaziolaw.com

Jason Tangeman
Anthony Nicholas Goodrich & Tangeman
jtangeman@wyolegal.com

Rick L. Koehmstedt
Schwartz, Bon, Walker & Struder, LLC
rick@schwartzbon.com

Michael T. McConnell
McConnell Fleischner Houghtaling &
Craigmile, LLC
mmcconnell@mfhc.com

Thomas N. Fitzgibbon
Kimberly L. Thigpen
Pfeiffer Thigpen FitzGibbon & Ziontz LLP
tnf@ptflaw.com
klt@ptflaw.com

_s/_ _____